# United States Court of Appeals
# for the Fourth Circuit

JULIA KIM, DAVID SYDNEY, MARTIN NOVICK, J. RENEE BRENNAN
LIVING TRUST, SCOTT SCHROEPFER, AND KENNETH KAMHOLZ,
individually and on behalf of others similarly situated,
*Plaintiffs-Appellants,*

v.

CEDAR REALTY TRUST, INC., BRUCE J. SCHANZER, GREGG A.
GONSALVES, ABE EISENSTAT, STEVEN G. ROGERS, SABRINA KANNER,
DARCY D. MORRIS, RICHARD H. ROSS, SHARON STERN, CEDAR
REALTY TRUST PARTNERSHIP, L.P. AND WHEELER REAL ESTATE
INVESTMENT TRUST, INC.
*Defendants-Appellees*

---

Appeal from the United States District Court
for the District of Maryland at Baltimore
Case No. 22-cv-01103 (The Honorable George Levi Russell III)

---

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

---

Matthew Heffner
Matthew Hurst
Heffner Hurst
30 North LaSalle Street, Suite 1210
Chicago, IL 60602
312-346-3466

Joshua E. Fruchter
Wohl & Fruchter LLP
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
845-290-6818

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on inside cover)*

Lawrence Deutsch
Andrew D. Abramowitz
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
215-875-3000

Donald J. Enright
Levi & Korsinsky, LLP
1101 Vermont Ave., N.W., Suite 700
Washington, DC 20005
202-524-4290

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .......................................................3

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE................................................................4

A. Narrative statement of facts ...........................................................4

    1.      The Director Defendants initiate a sales process intended to unlock the value of Cedar's grocery-anchored shopping centers for the benefit of Cedar's Common Stockholders. ...............................4

    2.      The Defendants structure the Transactions to enrich themselves at the expense of Preferred Stockholders. .............................................8

    3.      The market cap of the Preferred Stock plunges after Cedar announces the Transactions, crushing Preferred Stockholders but benefitting Defendants. ..................................................13

    4.      The Director Defendants lie to Preferred Stockholders concerning the value of the Wheeler Properties. ................................15

B. Relevant procedural history and rulings below presented for review.................18

SUMMARY OF THE ARGUMENT .....................................................19

STANDARD OF REVIEW ...................................................................24

ARGUMENT ........................................................................................25

I.    The Complaint adequately alleges a claim against Cedar for breach of Section 7 of the Articles. ..............................................25

    A.    Maryland law requires a rigorous analysis of language and context when evaluating a contractual provision for ambiguity..........25

    B.    The District Court erred in concluding without any analysis that the Neither/Nor Clause was unambiguous and not susceptible to Plaintiffs' interpretation. ..................................................29

        1.      Based on *Plank*, Plaintiffs' interpretation of the

Neither/Nor Clause is correct as a matter of law. .....................31

     2.    Based on context, Plaintiffs' interpretation of the Neither/Nor Clause is correct as a matter of law. .....................32

     3.    Based on grammar, Plaintiffs' interpretation of the Neither/Nor Clause is correct as a matter of law. .....................35

II.    The Complaint adequately alleges a claim against Cedar for breach of the good faith duty. ........................................................................38

    A.    Maryland law recognizes an implied duty of good faith and fair dealing in every contract. ....................................................38

    B.    The District Court erred when it held that Plaintiffs could no longer assert a claim for breach of the good faith duty after their claims for breach of express provisions of the Articles had been dismissed. ...........................................................................40

III.   The Complaint adequately alleges a claim against the Director Defendants for breach of fiduciary duty. ........................................43

    A.    The District Court ignored Maryland law when it concluded that Plaintiffs' fiduciary duty claim was superfluous. .........................43

    B.    The Director Defendants breached their fiduciary duty of good faith by structuring the Transactions to enrich themselves at the expense of Preferred Stockholders. .....................................45

    C.    The District Court erred when it held that the Director Defendants were obligated to maximize value for Common Stockholders at the expense of Preferred Stockholders. .....................48

IV.   The Complaint adequately alleges claims against Wheeler for tortious interference with contractual rights and aiding and abetting a breach of fiduciary duty. ...........................................................................52

CONCLUSION .....................................................................................53

REQUEST FOR ORAL ARGUMENT ..................................................54

**Page(s)**

**Cases**

*Allen v. Brown Advisory, LLC*,
    41 F.4th 843 (7th Cir. 2022) ................................................................. 44

*Automatic Laundry Serv., Inc. v. Demas*,
    141 A.2d 497 (1958) ............................................................................. 38

*Behram v. Adventist Health Care, Inc.*,
    2023 WL 4011686 (Md. Ct. Spec. App. June 15, 2023) ...................... 40

*Britt v. DeJoy*,
    45 F.4th 790 (4th Cir. 2022) ................................................................... 3

*Clancy v. King*,
    954 A.2d 1092 (Md. 2008) ............................................................ 38, 43

*Dominion Rental Holdings, LLC v. Shannon Menapace, et al.*,
    2023 WL 1097346 (Md. Ct. Spec. App. Jan. 30, 2023) ...................... 25

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ................................................................ 25

*Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*,
    213 F.3d 175 (4th Cir. 2000) ........................................................ passim

*Eastland Food Corp. v. Mekhaya*,
    301 A.3d 308 (Md. 2023) ..................................................................... 45

*Equity-Linked Invs., L.P. v. Adams*,
    705 A.2d 1040 (Del. Ch. 1997) ........................................................... 51

*Impac Mortg. Holdings, Inc. v. Timm*,
    255 A.3d 89 (Md. 2021) ........................................................ 25, 26, 31

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ................................................................ 45, 46

*K & D Holdings, LLC v. Equitrans, L.P.*,
    812 F.3d 333 (4th Cir. 2015) .......................................................... 29, 31

*Kim v. Cedar Realty Tr., Inc.*,
    2023 WL 4896635 (D. Md. Aug. 1, 2023) ...........................................19

*LC Capital Master Fund, Ltd. v. James*,
    990 A.2d 435 (Del. Ch. 2010) .................................................. passim

*Leviness v. Consol. Gas, Elec. Light & Power Co. of,*
    *Balt.*, 80 A. 304 (Md. 1911) ...............................................................45

*Magnetti v. Univ. of Maryland*,
    909 A.2d 1101 (Md. App. 2006) .......................................................42

*Magnetti v. Univ. of Maryland*,
    937 A.2d 219 (Md. 2007) ..................................................................42

*Meyer v. CUNA Mut. Ins. Soc.*,
    648 F.3d 154 (3d Cir. 2011) .......................................................31, 36

*Mount Vernon Props., LLC v. Branch Banking and Tr. Co.*,
    907 A.2d 373 (Md. App. 2006) ...................................................41, 42

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010)...........................................................43, 44

*Plank v. Cherneski*,
    231 A.3d 436 (Md. 2020) ...................................... 22, 29, 30, 31, 44

*Planned Parenthood of Middle Tennessee v. Sundquist*,
    1998 WL 467110  (Tenn. Ct. App. Aug. 12, 1998) ............................31

*Poling v. CapLease, Inc.*,
    2016 WL 1749803 (Md. Ct. Spec. App. May 3, 2016)..........… 32, 39, 51

*Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*,
    1999 WL 893575 (Del. Ch. Oct. 13, 1999)........................................39

*Questar Builders, Inc. v. CB Flooring, LLC*,
    978 A.2d 651 (Md. 2009) ..................................................................39

iv

*SouthTrust Bank v. Copeland One, L.L.C.*,
   886 So. 2d 38 (Ala. 2003) ....................................................................31

*Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*,
   938 F.3d 113 (4th Cir. 2019) ......................................................... 26, 32

*Tapestry, Inc. v. Factory Mut. Ins. Co.*,
   286 A.3d 1044 (Md. 2022) ...................................................................26

*United Parcel Serv. v. Strothers*,
   286 A.3d 23 (Md. App. 2022) ..............................................................29

*Wag More Dogs, LLC v. Cozart*,
   680 F.3d 359 (4th Cir. 2012) ...............................................................24

*Weichert Co. of Maryland v. Faust*,
   19 A.3d 393 (Md. App. 2011) ..............................................................26

*Zucker, Tr. of Anita G. Zucker Tr. Dated Apr. 4, 2007, as Subsequently Amended
   or Restated v. Bowl Am., Inc.*,
   2022 WL 1720151 (D. Md. May 27, 2022) ........................................45

## Statutes

28 U.S.C. § 1291 .........................................................................................3

28 U.S.C. § 1332(d) ....................................................................................3

Md. Code Ann., Corps. & Ass'ns § 2-405.1 ............................................45

## Rules

Fed. R. Civ. P. 12(b)(6)..............................................................................24

## Miscellaneous

The Chicago Manual of Style (17th edition 2017) ........................... 36, 37

## INTRODUCTION

The Director Defendants collectively owned 11.6% of the publicly-traded Common Stock of Defendant Cedar Realty Trust—a real estate investment trust (REIT) that managed a portfolio of 52 properties. In June 2021, the Director Defendants decided to sell Cedar, and targeted $29.00 per common share as their price (about $396 million based on 13.6 million common shares outstanding). Standing in the way of that payout, however, were two contractual rights granted to Cedar's Preferred Stockholders—*first*, a priority payment of $161.3 million if a sale qualified as a liquidation, and *second*, a right to convert their Preferred Stock into Common Stock if a sale qualified as a "Change of Control."

A sale triggering either right would sharply reduce the payout to the Director Defendants and Cedar's other Common Stockholders. As such, in an effort to circumvent these rights and hit the targeted payout of $29.00 per common share, the Director Defendants orchestrated a convoluted series of carefully sequenced Transactions that (i) sold 33 of Cedar's most valuable properties to a third party for $266 million in cash, (ii) left Cedar holding a portfolio of 19 inferior properties that were promptly mortgaged for another $130 million in cash (bringing the total proceeds to $396 million), (iii) delisted the Common Stock but kept the Preferred Stock outstanding as a publicly-traded security of Cedar, and (iv) transferred 100% ownership of Cedar's Common Stock to Defendant Wheeler Real Estate Investment

Trust, a financially distressed REIT with a dysfunctional management team, a market capitalization of just $18.9 million, and a long history of not paying dividends to its own preferred shareholders.

When the dust settled, the outcome was a bonanza for the Director Defendants and Cedar's other Common Stockholders—and a disaster for Preferred Stockholders. Precisely as the Director Defendants had envisioned, Cedar distributed the $396 million in cash proceeds exclusively to Common Stockholders, including $46 million directly to the Director Defendants. Nothing was distributed to Preferred Stockholders. Instead, Preferred Stockholders remain trapped inside Cedar—a shell of its former self now fully controlled by Wheeler.

Predictably, given Wheeler's dismal track record, this outcome caused the prices of Cedar's Preferred Stock to crash by over 50% when the Transactions were announced. Commenting on the crash and over $80 million in losses suffered by Preferred Stockholders, one Wall Street REIT analyst opined that sending Preferred Stockholders "to purgatory" was the "driving factor behind the deal structure."

These facts adequately allege claims under Maryland law: (i) against Cedar for breach of express and implied provisions of the Articles Supplementary ("Articles") governing the contractual rights of Preferred Stockholders; (ii) against the Director Defendants for breach of fiduciary duties owed to Preferred Stockholders; and (iii) against Wheeler for tortious interference with contractual

rights and aiding and abetting a breach of fiduciary duty. The District Court erred when it dismissed these claims; this Court should reverse.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the class action below under 28 U.S.C. § 1332(d). On August 28, 2023, Plaintiffs timely filed a notice of appeal from the district court's order entered August 1, 2023 ("August 1 Order"). This Court has jurisdiction over Plaintiffs' appeal under 28 U.S.C. § 1291 since the August 1 Order dismissed all of the claims in the amended consolidated class action complaint ("Complaint"), and expressly denied leave to amend. (JA414). *See Britt v. DeJoy*, 45 F.4th 790, 792-94 (4th Cir. 2022).[1]

## STATEMENT OF THE ISSUES

**Issue #1:** Section 7 of the Articles grants Preferred Stockholders the right to convert their Preferred Stock into Common Stock in the event of a "Change of Control." Under Maryland's rules of contract construction, did the District Court err in concluding that the Transactions did not constitute a "Change of Control?" *See* Point I *infra*.

**Issue #2:** Maryland law entitles plaintiffs to assert a claim for breach of the

---

[1] Citations to "JA" refer to pages in the Joint Appendix filed simultaneously herewith. Cross-references to (i) "Facts-A." refer to pertinent portions of the "Narrative Statement of Facts" section in the Statement of the Case, and (ii) "Point" refers to pertinent portions of the Argument. All emphasis in quotations is added unless otherwise noted. All internal quotation marks and citations are omitted.

implied duty of good faith and fair dealing ("Good Faith Duty") even in the absence of a claim for breach of an express provision of a contract. Did the District Court err in concluding that Plaintiffs could not assert a claim for breach of the Good Faith Duty in the absence of a claim for breach of an express provision of the Articles? *See* Point II *infra*.

**Issue #3:** Maryland law entitles a plaintiff to assert an independent fiduciary duty claim even if it is based on the same facts as a contractual claim. Did the District Court err in dismissing Plaintiffs' claim for breach of fiduciary duty given that, in connection with the Transactions, the Director Defendants breached fiduciary duties owed to Preferred Stockholders? *See* Point III *infra*.

## STATEMENT OF THE CASE

### A. Narrative statement of facts

**1. The Director Defendants initiate a sales process intended to unlock the value of Cedar's grocery-anchored shopping centers for the benefit of Cedar's Common Stockholders.**

Prior to the Transactions, Cedar owned and managed a portfolio of 52 properties, including a substantial number of grocery-anchored shopping centers in high-density urban markets "in the attractive D.C. to Boston corridor." (JA032, JA048, JA090-091). Its equity capital consisted of (i) publicly-traded common stock ("Common Stock"), and (ii) two series of publicly-traded preferred stock ("Preferred Stock") paying dividends totaling $10.7 million per year: 7.25% Series B Preferred Stock, and 6.50% Series C Preferred Stock. (JA038). Plaintiffs are holders of both

Series B and Series C Preferred Stock. (JA031-032).

On June 3, 2021, during a meeting with the Director Defendants, Cedar management "highlighted what appeared to be heightened investor interest in secondary-market grocery anchored shopping centers," and a "growing evolution in the real estate investment market, wherein investors were drawn to the relative stability of grocery-anchored shopping centers." (JA131). At the time, Cedar's Common Stock was trading for approximately $14 per share, but Cedar's management projected that a liquidation might pay Common Stockholders as much as $29.00 per share. (JA055).

The Director Defendants, who held large amounts of Common Stock, had a personal interest in maximizing the payout to Common Stockholders from any sale (JA033-035; JA185):

| Name/Title | Common Shares | Proceeds at $29 per share |
|:---:|:---:|:---:|
| Bruce Schanzer (CEO/Director) | 380,687 | $11 million |
| Gregg Gonsalves (Chairman of the Board) | 18,626 | $540,154 |
| Abe Eisenstat (Director) | 41,829 | $1.2 million |
| Sabrina Kanner (Director) | 16,897 | $492,623 |
| Darcy Morris (Director and Principal of Ewing Morris, Cedar's | 1,105,770 | $32 million |

| second largest common stockholder) | (held primarily through Ewing Morris) | |
|---|---|---|
| Richard Ross (Director) | 2,493 | $72,297 |
| Sharon Stern (Director) | 6,093 | $176,697 |
| Steven Rogers* (Director) | 19,746 | $572,634 |
| *Rogers also owned Preferred Stock: 449 shares of the Series B (worth $5,814.55, as of March 3, 2022). (JA035). Given the *de minimis* value of his Preferred Stock position relative to his Common Stock holdings, Rogers was—like the other Director Defendants—motivated to maximize the payout to Common Stockholders. (JA035). | | |

Because the Director Defendants owned substantial amounts of Common Stock—but virtually no Preferred Stock—the interests of the Director Defendants and Preferred Stockholders were in direct conflict during the sales process, as the District Court acknowledged. (JA406 (finding that "the interests of the preferred and common stockholders were at odds during the merger.")). The Director Defendants were motivated to maximize the payout to themselves and other Common Stockholders, but the Articles granted two rights to Preferred Stockholders that stood in the way of achieving that objective.

*First*, Section 4(a) of the Articles entitled Preferred Stockholders to a priority liquidation payment of $25.00 per share of Preferred Stock in connection with any liquidation ("Liquidation Preference"). (JA039). As of March 2, 2023, the Liquidation Preference was valued at $161.3 million: (i) $25.00 per share x

5,000,000 shares of Series C Preferred Stock ($125.0 million), and (ii) $25.00 per share x 1,450,000 shares of Series B Preferred Stock ($36.3 million). (JA024, JA038-039). This meant that Preferred Stockholders would be entitled to the first $161.3 million in proceeds from any transaction qualifying as a liquidation before Common Stockholders got paid anything at all. (JA075).

*Second*, Section 7 of the Articles granted Preferred Stockholders the right to convert shares of Preferred Stock into shares of Common Stock in connection with any transaction or series of transactions that qualifies as a "Change of Control" (the "Conversion Right"). (JA041-042, JA343-345). Section 5(j) of the Articles defines a "Change of Control" as any transaction or series of transactions transferring greater than 50% voting control to a buyer if, after the transaction closes, "*neither* [Cedar] *nor* the acquiring *or* surviving entity has" a class of publicly-traded common stock. (JA043, JA341). This meant that, in connection with any transactions qualifying as a "Change of Control," the increased number of common shares resulting from conversion of Preferred Stock into Common Stock would dilute the payout to Common Stockholders. (JA025).

Despite the divergent interests of the Director Defendants and Preferred Stockholders, the Director Defendants initially promised in a press release distributed on September 9, 2021, that they were "committed to maximizing value for *all* our shareholders." (JA056). Notably, the release did not distinguish between

Common and Preferred Stockholders. (JA056). Subsequently, however—after conferring with Wheeler—the Director Defendants structured the Transactions in a manner that generated $396 million for themselves and other Common Stockholders, but nothing at all for Preferred Stockholders. (JA024).

### 2. The Defendants structure the Transactions to enrich themselves at the expense of Preferred Stockholders.

As part of their deliberations, the Director Defendants explored different structures, including a sale or merger of the entire company versus what they ultimately pursued: selling off Cedar's properties as separate portfolios consisting of (i) 33 of Cedar's most valuable grocery-anchored shopping centers with higher average occupancy rates and rent per square foot ("Grocery-Anchored Properties"), (ii) 19 less desirable shopping centers (referred to in the Proxy as the "Remainco" portfolio) with lower average occupancy rates and rent per square foot, and (iii) 2 mixed-use redevelopment projects. (JA023, JA056, JA090-091).

During the latter part of 2021 and into 2022, the Director Defendants solicited and reviewed numerous proposals to acquire the entire company or specific portfolios. (JA056-057). Among these was a bid submitted by Wheeler in January 2022 that proposed to leave Cedar's Preferred Stock outstanding, and pay for the 19-property Remainco portfolio in part by assuming the obligation to pay the Liquidation Preference to Preferred Stockholders in the event of any future liquidation. (JA057).

Several of the Director Defendants knew Wheeler well. In November 2017, while Defendants Schanzer, Gonsalves, Eisenstat, and Rogers were serving on the Cedar Board (JA033-035), Wheeler had proposed merging with Cedar. (JA046). Without distinguishing between Common and Preferred Stockholders, the Cedar Board rejected the November 2017 proposal as "not in the best interest of Cedar and its shareholders" due to Wheeler's poor financial performance, recent dividend cuts, lower quality properties, high leverage, and much smaller market cap (*i.e.*, $550 million for Cedar versus $95 million for Wheeler). (JA047-048).

In subsequent years, Wheeler endured management dysfunction (cycling through four different CEO's in four years), and a proxy contest that featured extensive mudslinging. (JA052-055). Wheeler's financial condition also sharply deteriorated, leading it to suspend dividend payments on its own Series A, Series B and Series D preferred stock, and later eliminate (i) all of the accumulated and unpaid dividends of its Series A and B preferred stock (totaling nearly $12 million), and (ii) cumulative dividend rights so that no further dividends would accrue going forward on its Series A and B preferred stock. (JA050). Meanwhile, unpaid dividends continued to accrue on Wheeler's Series D preferred stock. (JA050).

As of December 31, 2021, Wheeler's outstanding obligation to Series D preferred stockholders had ballooned to approximately $105 million (JA051), while the market capitalization of Wheeler's common stock had fallen 80% to $18.9

million (JA050), and Wheeler's unrestricted cash balance was only $22 million. (JA051). As of November 6, 2023, Wheeler's market capitalization had dropped below $1 million.[2]

Yet, despite their awareness of Wheeler's long history of dismal financial performance, management dysfunction and preferred shareholder oppression—and the possibility of an alternative transaction that would have paid a cash distribution to Preferred Stockholders (JA058)—the Director Defendants opted to transact with Wheeler via a series of convoluted steps that ultimately distributed $396 million to Common Stockholders (including $46 million to the Director Defendants), and nothing to Preferred Stockholders, who were instead left holding publicly-traded Preferred Stock of Cedar under Wheeler's control. (JA024-025, JA087-088).

*First*, in July 2022, Cedar sold the 33 higher quality Grocery-Anchored Properties, plus the mixed-use projects, to DRA Advisors for $913 million, including assumed mortgage debt ("Grocery-Anchored Sale"). (JA023, JA059). The proceeds of the Grocery-Anchored Sale were then used to discharge Cedar's remaining liabilities, and the net cash—totaling $266 million—was held for distribution exclusively to Cedar's Common Stockholders in the form of a dividend payable upon—and only upon—the closing of the Wheeler Merger (as defined in the next paragraph). (JA057, JA060, JA063, JA087).

---

[2] *See* https://www.google.com/finance/quote/WHLR:NASDAQ?hl=en.

*Second*, in August 2022, after the closing of the Grocery-Anchored Sale, Wheeler acquired 100% ownership of Cedar's Common Stock via a merger with a Wheeler subsidiary that left Cedar as the "surviving entity," and a wholly-owned subsidiary of Wheeler ("Wheeler Merger"). (JA060, JA063, JA088, JA254). Simultaneously, Cedar's publicly-traded Common Stock was delisted and cancelled, while Cedar's Preferred Stock remained outstanding as a publicly-traded security of Cedar. (JA063, JA268). As the sole holder of Cedar's common shares, Wheeler assumed control over authorizing future dividends to Preferred Stockholders by its right to appoint all of Cedar's directors. (JA045-046, JA060-061).

*Third*, as a result of the Wheeler Merger, Wheeler obtained effective control over the 19 properties in the Remainco portfolio (hereinafter, the "Wheeler Properties"), which remained nominally owned by Cedar. (JA023). The Director Defendants purported to value the Wheeler Properties at $291.3 million, which Wheeler paid for by (i) borrowing $130 million from KeyBank (using the Wheeler Properties as collateral), and (ii) assuming (through its 100% ownership of Cedar) the contingent obligation to pay the $161.3 million Liquidation Preference in the event of any future liquidation. (JA061-062, JA067-068).

*Fourth*, upon receipt of the KeyBank loan proceeds, Wheeler transferred the $130 million to Cedar, which Cedar combined with the $266 million in cash proceeds remaining from the Grocery-Anchored Sale. (JA057-058, JA063). On or

about August 26, 2022, Cedar distributed the entire sum—totaling $396 million— exclusively to Cedar's Common Stockholders (including $46 million paid to the Director Defendants). (JA024, JA060). Nothing was paid to Preferred Stockholders. (JA024).

Before any of the steps above could be implemented, however, the Director Defendants required the approval of Cedar's Common Stockholders. (JA095-096). They solicited such approval via the Proxy disseminated on April 21, 2022 (JA094), and received such approval on May 27, 2022, when a majority of the Common Stockholders voted in favor of the Transactions. (JA334). In contrast, although their economic rights were dramatically impaired by the Transactions, Preferred Stockholders were not granted the right to vote on the Transactions. (JA059). Nor did the Director Defendants ever implement any procedural safeguards to protect the interests of Preferred Stockholders during the sales process (such as appointing an independent agent to advocate for the interests of Preferred Stockholders). (JA059). Instead, the Director Defendants retained a financial advisor to opine only that the Transactions were fair to Common Stockholders. (JA059). The financial advisor, however, explicitly declined to express any view on the fairness of the Transactions to Preferred Stockholders. (JA059).

### 3. The market cap of the Preferred Stock plunges after Cedar announces the Transactions, crushing Preferred Stockholders but benefitting Defendants.

Before Cedar announced the Transactions, its Preferred Stock was deemed a secure and "highly attractive" investment due to Cedar's track record for paying dividends, as well as its portfolio of 52 properties that generated cash flow that easily covered the dividends payable to Preferred Stockholders. (JA065). Consistent with this low perceived risk, on March 2, 2022—the last trading day before Cedar announced the Transactions—the Series C Preferred Stock closed at $22.85 per share (slightly below the $25.00 Liquidation Preference), and the Series B Preferred Stock closed at $25.61 per share (slightly above the $25.00 Liquidation Preference). (JA065).

On March 2, 2022, after the markets closed, Cedar announced the Transactions. (JA065). Instantly, the perceived risk of the Preferred Stock rose dramatically as the market digested that (i) control over the future payment of dividends to Preferred Stockholders had shifted to Wheeler with its long history of preferred shareholder oppression, management dysfunction, and dismal financial performance (JA049-054, JA068), and (ii) the 19 properties remaining with Cedar to cover future payment of preferred dividends were of substantially lower quality than the Grocery-Anchored Properties in terms of average occupancy rates and rent per square foot. (JA079, JA090-091).

Predictably, on March 3, 2022 (the next trading day), Preferred Stockholders suffered massive losses as the price of Cedar's Series C Preferred Stock plummeted 56.89% to close at $9.85 per share, and the price of Series B Preferred Stock tanked 49.44%, to close at $12.95 per share. (JA026). As a result of these steep declines, the market value of the Preferred Stock fell from approximately $151.4 million at the close on March 2, 2022, to $68.0 million at the close on March 3, 2022, representing over $80 million in losses. (JA026).

In the wake of the carnage suffered by Preferred Stockholders, a REIT analyst at Raymond James—the investment bank that underwrote the sale of Series C Preferred Stock to the public—sharply criticized the Transactions as "legal gymnastics" that set a "bad precedent for the REIT industry." (JA066, JA382-383). He concluded that sending the Preferred Stockholders to "purgatory" was the "driving factor behind the deal structure." (JA066, JA383).

In contrast to the severe harm inflicted on Preferred Stockholders, the crash in the Preferred Stock prices massively benefitted Wheeler by positioning it to buy back the Preferred Stock on the open market—and thereby eliminate its obligation to pay the $161.3 million Liquidation Preference—for just $68 million in cash, and thus pay a total of just $198 million for the Wheeler Properties (*i.e.*, $68 million market value of the Preferred Stock as of March 3, 2022 + $130 Million KeyBank

loan). (JA068-069). This cost was well below the fair market value of the Wheeler Properties (as further discussed in Facts-4 below). (JA069)

While Wheeler did not immediately capitalize on this lucrative arbitrage opportunity, the option to buy back Preferred Stock at a deep discount to the Liquidation Preference—and dramatically reduce the cost of the Wheeler Properties—conferred a massive benefit on Wheeler that will persist for so long as the prices of the Preferred Stock remain depressed. (JA027, JA068-070). As one Preferred Stockholder observed in an article published on SeekingAlpha.com on July 1, 2022, "[t]his deal is a home run for [Wheeler]. . . if [Wheeler] finds a way to buy back even a portion of the CDR preferreds near the current depressed prices." (JA069). On July 8, 2022, after the market cap of the Preferred Stock dropped below $50 million, the same Preferred Stockholder further observed, if "WHLR found a way to buy back the CDR preferreds at current prices, they get the 19 remaining centers for $110M less. A home run/grand slam deal for them." (JA069). As of November 6, 2023, the Preferred Stock prices remained depressed.[3]

4. **The Director Defendants lie to Preferred Stockholders concerning the value of the Wheeler Properties.**

Despite the Director Defendants' promise in September 2021 to maximize value for "*all* our shareholders," a March 2022 press release announcing the

---

[3] *See* https://www.google.com/finance/quote/CDR-C:NYSE?hl=en, and https://www.google.com/finance/quote/CDR-B:NYSE?hl=en

Transactions conceded that they were only "the best possible outcome for our *common* shareholders." (JA067). In the Proxy, Director Defendants likewise acknowledged that the Transactions were only "in the best interests of the Company and the *common* stockholders." (JA059).

Aware that the Transactions were a terrible outcome for Preferred Stockholders, the Director Defendants sought to mislead Preferred Stockholders into concluding that their economic interests were protected by the equity remaining in the Wheeler Properties that Cedar (as Wheeler's subsidiary) continued to nominally own after the Transactions closed. (JA067). They did this by repeatedly misrepresenting in Cedar's public filings that the Wheeler Properties were valued at $291.3 million. (*See* JA067, JA370 ("Wheeler will acquire the balance of the Company's shopping center assets by way of an all-cash merger transaction that values the remaining portfolio at $291.3 million."); JA067, JA377 (press release stating same); JA067-068 (Proxy repeatedly stating same).

If the Wheeler Properties had actually been worth $291.3 million, the Transactions would have left $161.3 million of equity in the Wheeler Properties to cover the $161.3 million Liquidation Preference after deducting the $130 million KeyBank loan collateralized by the Wheeler Properties (*i.e.*, $291.3 million - $130 million = $161.3 million). (JA027-028). The KeyBank loan documents, however, indicate that the Wheeler Properties had only been valued at $236 million as of

March 2, 2022, and that the Director Defendants lied when they publicly stated that the Wheeler Properties had been valued at $291.3 million. (JA028, JA061-062, JA067-068).

The KeyBank loan documents shared by Wheeler with the Director Defendants reflect that KeyBank appraised the Wheeler Properties, and capped the amount it was willing to lend against those properties at 55% of the appraised value (known as the loan-to-value ("LTV") ratio). (JA062, JA356). Since the Director Defendants stated in September 2021 that the objective of the sales process was "to maximize shareholder value" (JA056), and later stated in March 2022 that the Transactions represented "the best possible outcome" for Common Stockholders (JA067), the reasonable inference is that when Wheeler borrowed money from KeyBank to finance the $130 million dividend paid to Common Stockholders, Wheeler did not leave money on the table but instead borrowed the maximum amount that KeyBank was willing to lend against the appraised value of the Wheeler Properties (*i.e.*, 55%). (JA062, JA077). Since the sum borrowed by Wheeler from KeyBank was $130 million, the reasonable inference is that KeyBank appraised the Wheeler Properties at $236 million (*i.e.*, $130 million/0.55 LTV ratio). (JA023, JA057, JA062).

Corroborating the $236 million value of the Wheeler Properties indicated by the KeyBank loan, a private commercial real estate investment firm (referred to in

the Proxy as Party C) had offered during the sales process to pay $240 million in cash for the Wheeler Properties (*i.e.*, the Remainco portfolio). (JA057, JA068).

Since the Wheeler Properties were plausibly only worth approximately $240 million when Cedar announced the Transactions, there was only approximately $110 million of equity left in the Wheeler Properties to cover the $161.3 million Liquidation Preference after subtracting the $130 million KeyBank loan (*i.e.*, $240 million - $130 million = $110 million). (JA028, JA064-065, JA076-077). The Director Defendants sought to conceal this fact from Preferred Stockholders by publicly misrepresenting the value of the Wheeler Properties at $291.3 million in Cedar's public filings. (JA067-068).

## B. Relevant procedural history and rulings below presented for review

On June 23, 2022, in an oral ruling, the District Court denied motions to preliminarily enjoin the Transactions. (JA014). On September 9, 2022, Plaintiffs filed the Complaint. (JA015)

On October 7, 2022, Defendants moved to dismiss the Complaint (JA015), and Plaintiffs opposed. (JA015). Plaintiffs subsequently moved to (i) strike an exhibit attached to the reply brief of Cedar and Wheeler in further support of their motion to dismiss ("Motion to Strike") (JA016), and (ii) certify a question of law to the Maryland Supreme Court pertinent to resolving the claim for breach of the Good Faith Duty ("Motion to Certify"). (JA017). Defendants opposed these motions.

(JA016-018).

On August 1, 2023, pursuant to a Memorandum Opinion issued on August 1, 2023 (JA395; reported at *Kim v. Cedar Realty Tr., Inc*., 2023 WL 4896635 (D. Md. Aug. 1, 2023)), the District Court entered the August 1 Order dismissing Plaintiffs' claims (i) against Cedar for, *inter alia*, breach of Section 7 of the Articles, and breach of the Good Faith Duty (JA410-412); (ii) against the Director Defendants for breach of fiduciary duty (JA403-407); and (iii) against Wheeler for tortious interference with contractual rights, and aiding and abetting a breach of fiduciary duty. (JA412-413). Plaintiffs seek review of each of these rulings.

The August 1 Order also denied the Motion to Certify, and granted the Motion to Strike. (JA416-417). These rulings are not presented for review.

On August 28, 2023, Plaintiffs timely filed their notice of appeal from the August 1 Order and Memorandum Opinion. (JA418).

### SUMMARY OF THE ARGUMENT

The District Court's rulings should be reversed on several grounds.

*First*, the District Court erred in dismissing Plaintiffs' breach of contract claim against Cedar for failing to honor the Conversion Right in Section 7 of the Articles. Plaintiffs argued that the Transactions constituted a "Change of Control" (as that term is defined in the Articles), and therefore triggered the Conversion Right. Without undertaking any analysis, the District Court summarily held that (i) the

definition of "Change of Control" was not susceptible to Plaintiffs' interpretation, and (ii) the Transactions "clearly and unambiguously" did not constitute a "Change of Control" under the Articles, and thus did not trigger the Conversion Right under Section 7. (JA410-411).

The District Court's cursory ruling ignored Maryland caselaw requiring a far more rigorous analysis of language and context when determining whether a contractual provision is ambiguous. Here, controlling Maryland Supreme Court precedent concerning the meaning of the word "or," as well as context and the rules of grammar, support Plaintiffs' interpretation of the "Change of Control" provision as a matter of law; at a minimum, they demonstrate that the meaning of the "Change of Control" provision was at least susceptible to Plaintiffs' interpretation, and therefore ambiguous. As such, the Court should reverse dismissal of Plaintiffs claim against Cedar for breach of Section 7 of the Articles. *See* Point I *infra*.

*Second*, the District Court erred in dismissing Plaintiffs' claim against Cedar for breach of the Good Faith Duty. The District Court held that "Maryland does not recognize an independent cause of action for breach of the [Good Faith Duty]," and thus because "the Court has already dismissed Stockholder Plaintiffs' claims for breach of the liquidation preference and conversion rights under the Articles, the claim for breach of the duty of good faith and fair dealing must also fail." (JA411-412).

The District Court misapprehended Maryland law. While it is true that Maryland law does not recognize an independent claim for breach of the Good Faith Duty, that is only when such a claim is asserted as a separate count (as per the *Mount Vernon* decision cited by the District Court). *See* Point II.B *infra*. When, however, a claim for breach of the Good Faith Duty is asserted as part of a count alleging breach of contract—as Plaintiffs did here (JA074-080)—the claim for breach of the Good Faith Duty survives under Maryland law even in the absence of a viable claim for breach of an express provision of the contract. *See Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 178 (4th Cir. 2000) (affirming dismissal of claim for breach of an express provision, but vacating dismissal of claim for breach of implied covenant). Indeed, the Good Faith Duty is intended to apply precisely when there is no express provision to protect a party from the bad faith conduct of a counterparty. As such, the Court should reverse dismissal of Plaintiffs' claim against Cedar for breach of the Good Faith Duty. *See* Point II *infra*.

*Third*, the District Court erred in dismissing Plaintiffs' claims against the Director Defendants for breach of fiduciary duty on the ground that the "Articles expressly provide for the Stockholder Plaintiffs' rights under a merger, and thus the fiduciary duty claim is duplicative of the contract claim and must be dismissed." (JA405). Under Maryland law, a plaintiff may plead a fiduciary duty claim regardless of whether another cause of action—like breach of contract—is available

to redress the same conduct. *See Plank v. Cherneski*, 231 A.3d 436, 466 (Md. 2020) ("a breach of fiduciary duty claim may be pleaded without limitation as to whether there is another viable cause of action to address the same conduct."). Thus— because directors owe a fiduciary duty of good faith to preferred stockholders under Maryland law—Plaintiffs were entitled to assert a breach of fiduciary duty claim against the Director Defendants regardless of whether they also had contract claims based on the same set of facts. *See* Point III.A *infra*.

The Director Defendants breached the fiduciary duty of good faith owed to Preferred Stockholders by structuring the Transactions with the intent of enriching themselves at the expense of Preferred Stockholders. Well aware of Wheeler's history of dismal financial performance, management dysfunction, and preferred shareholder oppression, the Director Defendants unquestionably knew that leaving the Preferred Stockholders under Wheeler's control would sharply raise the risk profile of the Preferred Stock, immediately crash Preferred Stock prices, and devastate Preferred Stockholders. The Director Defendants proceeded anyway, consciously disregarding the foreseeably disastrous consequences to Preferred Stockholders.

Further, the Director Defendants approved collateralizing the Wheeler Properties to finance a $130 million distribution paid exclusively to the Director Defendants and other Common Stockholders (with nothing for Preferred

Stockholders). This substantial payout left the Wheeler Properties with insufficient equity to cover the Liquidation Preference that Wheeler had assumed in connection with the Transactions. The Director Defendants sought to conceal this deficit by lying about the value of the Wheeler Properties in Cedar's public filings.

By maneuvering to enrich themselves without regard for the interests of Preferred Stockholders, the Director Defendants plainly crossed the line into a breach of the fiduciary duty of good faith under Maryland law. *See* Point III.B *infra*.

While acknowledging that directors owe fiduciary duties to preferred stockholders under Maryland law, the District Court held that the "Director Defendants owed a duty to maximize the company's value to the common." (JA406). As authority for this proposition, the District Court cited *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435 (Del. Ch. 2010). (JA406).

The District Court's reliance on *LC Capital* was misplaced. The Maryland Supreme Court would not follow *LC Capital* to the extent it holds that a claim for breach of fiduciary duty is superfluous when the board honors the contractual rights of preferred stockholders. As shown, Maryland law entitles Plaintiffs to assert a breach of fiduciary duty claim against the Director Defendants based on the same facts underlying contractual claims. Further, even as a matter of Delaware law, *LC Capital* is distinguishable because the buyer there fully honored the contractual conversion right of preferred stockholders. Here, in contrast, the Director

Defendants argued (and the District Court held) that the Transactions did not trigger either the Conversion Right or the Liquidation Preference, which left Preferred Stockholders "in an exposed and vulnerable position vis-à-vis the board of directors" without any contractual right to protect them in connection with the Transactions. *LC Capital*, 990 A.2d at 448. Therefore, under *LC Capital*, the Director Defendants were obligated to treat Preferred Stockholders fairly, which they failed to do. *See* Point III.C *infra*.

For these reasons, the Court should reverse dismissal of Plaintiffs' claim against the Director Defendants for breach of fiduciary duty. *See* Point III *infra*.

*Fourth*, the District Court dismissed the claims against Wheeler for tortious interference with contractual rights, and aiding and abetting a breach of fiduciary duty, on the ground that it had dismissed the underlying breach of contract and breach of fiduciary duty claims against Cedar and the Director Defendants, respectively. (JA412-413). Thus, if the Court reverses dismissal of the underlying breach of contract and breach of fiduciary duty claims, it should also reverse dismissal of the claims against Wheeler. *See* Point IV *infra*.

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 364-65 (4th Cir. 2012). The Court "accept[s] as true all of the factual allegations

contained in the complaint" and "draw[s] all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

## ARGUMENT

I.    **The Complaint adequately alleges a claim against Cedar for breach of Section 7 of the Articles.**

A.    **Maryland law requires a rigorous analysis of language and context when evaluating a contractual provision for ambiguity.**

Articles supplementary are a species of contract governing the rights of preferred stockholders in a Maryland REIT. *See Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 93-94, 95-98, 112-15 (Md. 2021) (construing articles of Maryland REIT).[4]

Maryland courts follow the "objective" approach to interpreting contracts. *Impac*, 255 A.3d at 95. Under that approach, the first step in construing contract language "is to review that language within the 'four corners' of the contract and assess whether [the language] is ambiguous." *Id.* at 112. Whether a contract provision is ambiguous presents "an issue of law" that is reviewed de novo on

---

[4] On December 14, 2022, Maryland's highest court—the Maryland Court of Appeals—was renamed the Supreme Court of Maryland. *Dominion Rental Holdings, LLC v. Shannon Menapace, et al.*, 2023 WL 1097346, at *1 n.1 (Md. Ct. Spec. App. Jan. 30, 2023).

appeal. *Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 127 (4th Cir. 2019).

A contract provision is ambiguous if it is "susceptible of more than one meaning" when "viewed in the context of the entire contract and from the perspective of a reasonable person in the position of the parties." *Impac*, 255 A.3d at 96; *see also Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1056 (Md. 2022) (expanding analysis to context provided by other provisions of contract); *Sprint*, 938 F.3d at 129 (court should consider what interpretation makes the most sense in context).

As part of its analysis, a court may also consider dictionary definitions (*Sprint*, 938 F.3d at 128), as well as rules of grammar. *Impac*, 255 A.3d at 114); *see also Weichert Co. of Maryland v. Faust*, 19 A.3d 393, 405 (Md. App. 2011) (courts should interpret clause based on its "grammatical and syntactical structure.").

If a contract provision is ambiguous, "the court may consider extrinsic evidence to ascertain the mutual intent of the parties." *Impac*, 255 A.3d at 96; *accord Sprint*, 938 F.3d at 126. If the extrinsic evidence is inconclusive, Maryland law applies the doctrine of *contra proferentem*, and construes the ambiguity against the drafter. *Impac*, 255 A.3d at 97; *accord Sprint*, 938 F.3d at 131.

Here, the Court must construe de novo Section 7 of the Articles under Maryland's rules of contract construction to determine whether the Transactions

triggered the Conversion Right. Under Section 7(b)(i)-(vi), a transaction or series of transactions that qualify as a "Change of Control" entitle Preferred Stockholders to (i) convert their Preferred Stock into Common Stock pursuant to a prescribed ratio, and (ii) receive the same consideration as Common Stockholders are receiving in connection with the transaction(s). (JA042-043, JA343-345). The language requiring interpretation appears in Section 5(j), which defines "Change of Control" for purposes of Section 7 as follows:

> For the purposes of . . . Section 7 below, a "Change of Control" is when, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing *(x)* the acquisition by any person . . . of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation . . . and *(y)* following the closing of any transaction referred to in clause (x), *neither* the Corporation *nor* the acquiring *or* surviving entity has a class of [publicly traded] *common securities* . . .

(JA043, JA341).[5]

Because Wheeler acquired 100% of Cedar as part of the Transactions, there is no dispute that the Transactions satisfied subsection (x) of the paragraph above requiring an entity to acquire over 50% voting control of Cedar. The interpretative question, however, is whether the Transactions also satisfied subsection (y), which

---

[5] The Articles define "Corporation" to mean Cedar. As noted above, however, Cedar was also the "Surviving Entity" following the closing of the Wheeler Merger.

provides that a series of transactions will qualify as a "Change of Control" only if after the closing of any of the transactions "*neither* the Corporation *nor* the acquiring *or* surviving entity has a class of [publicly-traded] common securities" (the "Neither/Nor Clause").

### Defendants' Interpretation of the Neither/Nor Clause

Defendants argued below that the "or" in the Neither/Nor Clause functions like an "and." Thus, according to Defendants, a Change of Control cannot occur unless *both* the "acquiring entity" *and* the "surviving entity" involved in a transaction do not have publicly-traded common stock after the transaction closes (*i.e.*, the common stock of both entities has been delisted from a public exchange). Here, although the common stock of Cedar (the "surviving entity") was delisted after the Transactions closed, the common stock of Wheeler (the "acquiring entity") remains publicly-traded on Nasdaq, and thus (according to Defendants) the condition in the Neither/Nor Clause was not satisfied, and the Transactions were not a Change of Control triggering the Conversion Right.

### Plaintiffs' Interpretation of the Neither/Nor Clause

Plaintiffs argued below that the disjunctive phrase appearing after the "nor"— "the acquiring entity *or* surviving entity"—indicates alternatives, and thus a Change of Control occurs (and the Conversion Right is triggered) so long as *either* the acquiring entity *or* the surviving entity no longer has publicly-traded common stock

after the transaction closes. Here, although Wheeler's common stock remains publicly traded, Cedar's common stock was delisted after the Transactions closed, and thus (according to Plaintiffs) the condition in the Neither/Nor Clause was satisfied, and the Transactions constituted a Change of Control triggering the Conversion Right. Since Cedar failed to honor the Conversion Right in connection with the Transactions, Plaintiffs sued for breach of Section 7 of the Articles.

**B.      The District Court erred in concluding without any analysis that the Neither/Nor Clause was unambiguous and not susceptible to Plaintiffs' interpretation.**

The Maryland Supreme Court has indicated that the word "or" should generally be interpreted "in the disjunctive sense" to "indicate an alternative." *Plank v. Cherneski*, 231 A.3d 436, 478 (Md. 2020); *accord United Parcel Serv. v. Strothers*, 286 A.3d 23, 37 n.11 (Md. App. 2022). Thus, absent evidence of contrary intent appearing within the four corners of the Articles, the District Court should have applied *Plank* to interpret the "or" in the Neither/Nor Clause as indicating an alternative so that a Change of Control occurs if *either* the "acquiring entity" *or* the "surviving entity" is delisted after a transaction closes. *See K & D Holdings, LLC v. Equitrans, L.P.*, 812 F.3d 333, 339 (4th Cir. 2015) (holding that district court erred when it ignored disjunctive meaning of the word "or" in lease provision, based on direction of West Virginia Supreme Court that "the word 'or' . . . in the absence of

a contrary intent of the parties appearing from other parts of the lease, [shall] be given its ordinary meaning and not considered as meaning 'and'.").

Instead of applying *Plank*, the District Court summarily found that (i) the language of the Articles "clearly and unambiguously" supports the Defendants' interpretation, and (ii) "[w]hile 'or' may generally be interpreted 'to indicate an alternative,' the word must be read in context, and the Court finds that the plain language of the clause at issue does not support Stockholder Plaintiffs' position." (JA411). This cursory ruling, however, failed to undertake any analysis, let alone the rigorous analysis of language and context that Maryland law requires when evaluating a contractual provision for ambiguity. *See* Point I.A *supra*. Specifically, the District Court did not explain why it concluded that the relevant language "clearly and unambiguously" supports Defendants' interpretation. Nor did it identify the "context" to which it was referring, or explain why the "plain language" of the Neither/Nor Clause was not also susceptible to Plaintiffs' interpretation.

A rigorous analysis of the Neither/Nor Clause under Maryland's rules of contract construction demonstrates that the Court should reverse dismissal of Plaintiffs' claim for breach of Section 7 of the Articles either because Plaintiffs' interpretation of the Neither/Nor Clause is correct as a matter of law, or at a minimum, because the Neither/Nor Clause is at least susceptible to Plaintiffs' interpretation and therefore ambiguous.

30

### 1. Based on *Plank*, Plaintiffs' interpretation of the Neither/Nor Clause is correct as a matter of law.

As noted, the Maryland Supreme Court has instructed that the word "or" should generally be construed disjunctively to indicate an alternative. *Plank*, 231 A.3d at 478. This is also the dictionary definition. *See Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) ("Merriam Webster's Eleventh Collegiate Dictionary (2005) defines 'or' as . . . a function word to indicate an alternative.'"). Thus, absent evidence of contrary intent in the Articles, the Court should follow *Plank*. *See K & D*, 812 F.3d at 339 (following West Virginia Supreme Court's direction to interpret the word "or" disjunctively absent evidence of contrary intent elsewhere in the agreement).

At a minimum, the guideline in *Plank* coupled with the dictionary definition renders the Neither/Nor Clause at least susceptible to Plaintiffs' interpretation. *See Impac*, 255 A.3d at 114 (although defendant's interpretation of a provision was "a possible reading of that provision," it was not the only possible reading, and thus provision was ambiguous). Indeed, grammarians have observed that using "or" in contracts always "involves some risk of ambiguity" because the word "or" can be interpreted both exclusively (*i.e.*, A or B, but not both) and inclusively (*i.e.*, A or B, or both). *SouthTrust Bank v. Copeland One, L.L.C.*, 886 So. 2d 38, 42 (Ala. 2003) (citing grammar authorities); *see also Planned Parenthood of Middle Tennessee v. Sundquist*, 1998 WL 467110, at *12 n.26 (Tenn. Ct. App. Aug. 12, 1998) (citing

Bryan Garner that "or" may have an inclusive or exclusive sense"), *aff'd in part, rev'd in part on other grounds*, 38 S.W.3d 1 (Tenn. 2000).[6]

### 2.    Based on context, Plaintiffs' interpretation of the Neither/Nor Clause is correct as a matter of law.

As noted, under Maryland law, the ambiguity of a contractual provision must be evaluated based on "the *context* of the *entire contract* and from the perspective of *a reasonable person in the position of the parties*."  *See* Point I.A *supra*. Here, based on the context of the Articles, a reasonable person in the position of the parties would conclude that Plaintiffs' interpretation of the Neither/Nor Clause is correct.

The purpose of the Conversion Right and other provisions in the Articles triggered by a Change of Control is to protect Preferred Stockholders against a delisting, *i.e.*, holding Preferred Stock in a privately-held entity. (JA044). As one Maryland court has explained in connection with examining the conversion right provision in the Articles of another Maryland REIT:

> Many of the provisions in the Articles are not triggered until there is a Change of Control . . . Such provisions, including Section 9 [granting a conversion right], serve to ensure that, as the result of a particular type of transaction, preferred stockholders are not left holding preferred stock in a privately held company with no opportunity either to exercise voting rights or liquidate their holdings.

*Poling v. CapLease, Inc.*, 2016 WL 1749803, at *4 & n.10 (Md. Ct. Spec. App. May 3, 2016).

---

[6] This Court has cited Mr. Garner as a grammar authority. *Sprint*, 938 F.3d at 129.

Given that the purpose of the Change of Control provision is to protect Preferred Stockholders against holding Preferred Stock in a private entity, a reasonable person in the position of the parties reading Section 5(j) would interpret the Neither/Nor Clause to trigger a Change of Control upon Cedar's delisting *alone* without the necessity of Wheeler's common stock also being delisted. (*See* JA382 ("this is exactly the type of situation the change of control provisions were included to avoid in the first place.")). To conclude otherwise makes no sense because once the condition intended to trigger "Change of Control" protections occurs—*i.e.,* a transaction that would leave Preferred Stockholders holding Preferred Stock in a private entity—those protections should automatically kick in without first requiring fulfillment of a *second* condition that Wheeler's common stock must also no longer be publicly traded.

Other provisions of the Articles support this conclusion. *First*, Section 7(b)(i) of the Articles provides a formula to calculate the number of shares of Common Stock into which Preferred Stock is converted upon exercise of the Conversion Right ("Conversion Formula"). (JA042). One of the inputs to that formula is the "Common Stock Price," a defined term that, in connection with transactions that involve consideration other than cash, means "(ii) the average of the closing prices per share of Common Stock on the NYSE for the ten consecutive trading days immediately preceding . . . the effective date of the Change of Control." (JA043, JA344). Once

Cedar's Common Stock is delisted, the "Common Stock Price" input to the Conversion Formula becomes unworkable because there is no longer any publicly-traded common stock to determine its value. To illustrate: were Wheeler to sell Cedar to a third party in the future for consideration other than cash, there would be no publicly traded Common Stock Price to plug into the Conversion Formula since Cedar is now privately held. Since a transaction that delists Cedar's Common Stock renders a key input into the Conversion Formula unworkable in connection with any future transaction, a delisting of Cedar's Common Stock alone should trigger the Conversion Right without the necessity of also delisting the common stock of the "acquiring entity."

*Second*, to counterbalance the Cedar Board's power to declare and authorize payment of dividends to Preferred Stockholders (JA045), Section 6(b) of the Articles provides that if the preferred dividend is in arrears for six quarters, Preferred Stockholders may elect two directors to the Board. (JA342). These directors serve until all the preferred dividend arrears have been paid in full. (JA342). When Cedar has publicly-traded Common Stock, this provision has "teeth" because directors advocating for the payment of preferred dividend arrears can form alliances with directors elected by Common Stockholders who will be incentivized to pay the preferred dividend arrears in full because—until that happens—Common Stockholders themselves cannot receive any common dividends. (JA337-338). In

other words, the efficacy of Section 6(b) depends on the existence of a broad and diverse population of Common Stockholders holding publicly-traded common stock with the incentive and power to elect directors who will cooperate with the directors appointed by Preferred Stockholders to pay preferred dividend arrears in full, and thereby also restore the payment of common dividends.

Once, however, Cedar's common stock is delisted, and common stock ownership is concentrated in the hands of a single controlling stockholder (*i.e.*, Wheeler), the efficacy of Section 6(b) to protect Preferred Stockholders is eviscerated. That is because, as the sole Common Stockholder, Wheeler can populate management and stack the Board with its own hand-picked individuals (*see* JA060-061), and does not need common dividends to extract value from Cedar. As such, it can completely ignore any directors appointed by Preferred Stockholders after preferred dividends have been suspended for six quarters. Thus, since a transaction that delists Cedar's Common Stock eviscerates Section 6(b), a delisting of Cedar's Common Stock *alone* should trigger the Conversion Right without the necessity of also delisting the common stock of the "acquiring entity."

### 3. Based on grammar, Plaintiffs' interpretation of the Neither/Nor Clause is correct as a matter of law.

As noted, Maryland courts may use the rules of grammar to evaluate ambiguity. *See* Point I.A *supra*. Here, two rules of grammar support Plaintiffs' interpretation of the Neither/Nor Clause. *First*, if Defendants' interpretation were

correct, the "or" in the Neither/Nor Clause should have been replaced with a second "nor," and the Neither/Nor Clause should have read "*neither* the Corporation *nor* the acquiring <u>*nor*</u> the surviving entity has a class of [publicly-traded] common securities." (*See* JA394 (The Chicago Manual of Style (17th edition 2017), at § 5.234) ("Traditionally, only pairs are framed by neither-nor, but writers and speakers sometimes use a neither-nor-nor construction . . . [as in] 'Neither John nor Sally nor Brenda can attend the meeting. In that last example, some writers include only the last nor. But again, a simple neither-nor construction isn't recommended with three or more elements, the sequence neither-nor-nor being preferable.")). Since the Neither/Nor Clause could have but did not use the *neither-nor-nor* construction (which would have clarified the intent), Defendants' interpretation fails. *See Meyer*, 648 F.3d at 165 ("The commonly used and understood definition of 'or' suggests an alternative between two or more choices . . . Our conclusion that [plaintiff's] disjunctive interpretation of 'or' is reasonable is further supported by the fact that we may consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question in resolving ambiguity.").

*Second*, if Defendants' interpretation were correct, then the verb following the Neither/Nor Clause should have been the plural "have" (not the singular "has") since Defendants are arguing that the "or" functions as an "and" to require *both* the "acquiring entity" *and* the "surviving entity" to be delisted to trigger a Change of

Control. That is, the Neither/Nor Clause should have read "neither the Corporation nor the acquiring or surviving entity *have* a class of [publicly-traded] common securities" (instead of "neither the Corporation nor the acquiring or surviving entity *has* a class of [publicly-traded] common securities."). (*See* JA393 (Chicago Manual of Style (17th edition 2017), at § 5.205) ("Conjunctions such as *and* . . . indicate that grouped sentence elements impart plurality, so a plural verb is correct {the best vacation *and* worst vacation of my life *were* on cruises.")).

In contrast, if the Neither/Nor Clause is interpreted disjunctively to convey singular alternatives (*i.e.*, either the Corporation, or the acquiring entity, or the surviving entity), as Plaintiffs argue, then use of the singular verb "has" in the Neither/Nor Clause is grammatically correct. (*See* JA393 (Chicago Manual of Style (17th edition 2017), at § 5.205 ("or" "do[es] not impart plurality, so the singular verb is used if the elements are singular. {a squirrel *or* a chipmunk *raids* the bird feeder every day}")). That is, subject-verb agreement exists in the Neither/Nor Clause only if that clause is interpreted disjunctively.

* * *

Since the meaning of the Neither/Nor Clause is a question of law subject to de novo review, and Maryland Supreme Court precedent, context, and the rules of grammar all demonstrate that Plaintiffs' interpretation of the Neither/Nor Clause is the correct one, the Court should find that Plaintiffs have adequately plead a claim

for breach of Section 7 of the Articles as a matter of law based on Cedar's failure to honor the Conversion Right. Alternatively, at a minimum, the Court should find that the Neither/Nor Clause is ambiguous, reverse dismissal of Plaintiffs' claim for breach of Section 7 of the Articles, and remand to the District Court to consider extrinsic evidence of the intent of the Neither/Nor Clause (and if such evidence is inconclusive, apply the rule of *contra proferentem* against Cedar as the drafter).

## II.    The Complaint adequately alleges a claim against Cedar for breach of the good faith duty.

### A.    Maryland law recognizes an implied duty of good faith and fair dealing in every contract.

The Good Faith Duty broadly obligates a party to "refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *Clancy v. King*, 954 A.2d 1092, 1109 (Md. 2008); *accord Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000).

Even where a contract does not contain an express provision obligating the parties to act in good faith, "Maryland contract law implies such an obligation." *Clancy*, 954 A.2d at 1106 (citing Maryland Supreme Court cases); *see also Eastern Shore*, 213 F.3d at 182 ("Maryland law recognizes an implied covenant of good faith and fair dealing in all negotiated contracts."). Thus, the Good Faith Duty is as much a part of every contract as any express provision. *See Automatic Laundry Serv., Inc.*

*v. Demas*, 141 A.2d 497, 501 (1958) ("The implication of an obligation even though the obligation is not fully spelled out in the contract is no novelty in Maryland law.").

The purpose of implying a duty of good faith and fair dealing is to protect parties from bad faith conduct that does not violate an express provision of the contract; in other words, the implied duty kicks in precisely when there is no express provision protecting a party from such conduct. *See Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 671 (Md. 2009) ("where the right to terminate established by Paragraphs 12 and 14 left off, the implied obligation of good faith and fair dealing picks-up, thereby limiting the manner in which Questar was permitted to exercise its discretion."); *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575, at *10 (Del. Ch. Oct. 13, 1999) (implied duty "protects a party from arbitrary or unreasonable conduct that would deny it the fruits of the bargain without violating an express term of the contract."), *aff'd*, 751 A.2d 878 (Del. 2000).[7]

From these principles it follows that a plaintiff may assert a claim for breach of contract premised upon a breach of the Good Faith Duty even when there is no viable claim for breach of an express provision of the contract. Supporting that conclusion is this Court's decision in *Eastern Shore*, *supra*, where the plaintiff sued its landlord under Maryland law for (1) breach of an express covenant not to interfere

---

[7] "Maryland courts deem decisions of the Delaware Supreme Court and Chancery Court to be highly persuasive." *Poling*, 2016 WL 1749803, at *3 n.8.

with reasonable access to the plaintiff's grocery store premises, and (2) breach of an implied covenant to refrain from destructive competition. 213 F.3d at 178. The Court affirmed "the district court's dismissal of the claim for breach of an express covenant," but vacated dismissal of the claim for breach of the implied covenant. *Id.* As the Court explained after affirming dismissal of all claims arising out of express provisions of the contract (*id.* at 181), the complaint asserted a viable claim for "breach of the implied covenant of good faith and fair dealing, which Maryland clearly recognizes," and "[g]iving the claim its asserted scope, we cannot say that it fails under any probable set of facts to state a claim upon which relief can be granted." *Id.* at 185; *see also Behram v. Adventist Health Care, Inc.*, 2023 WL 4011686, at *16, 19-20 (Md. Ct. Spec. App. June 15, 2023) (holding that despite absence of an express contractual obligation for medical facility "to utilize any particular code for reporting" disciplinary proceedings against physician to regulatory authorities, jury could find facility's use of disparaging codes breached implied duty of good faith and fair dealing under Maryland law).

> **B.    The District Court erred when it held that Plaintiffs could no longer assert a claim for breach of the good faith duty after their claims for breach of express provisions of the Articles had been dismissed.**

The District Court dismissed Plaintiffs' claims for breach of the Good Faith Duty on the ground that it had "already dismissed Stockholder Plaintiffs' claims for breach of the liquidation preference and conversion rights under the Articles."

(JA411-412). In short, the District Court held that in the absence of a viable claim for a breach of an express contractual provision, a claim for breach of the Good Faith Duty must also be dismissed. As shown in Point II.A above, this was clear legal error. Indeed, the District Court's ruling would render the Good Faith Duty entirely superfluous, since paradoxically it could only apply in situations where it is not needed (*i.e.*, where one or more express provisions of the contract have also been breached and already provide a basis for recovery).

To be sure, as the District Court noted, "Maryland does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing." (JA411). But this is merely a technical pleading requirement obligating plaintiffs to assert any claim for breach of the Good Faith Duty in a count for breach of contract rather than as an independent cause of action—as explained in the very case cited by the District Court, *Mount Vernon Props., LLC v. Branch Banking and Tr. Co*., 907 A.2d 373 (Md. App. 2006). (JA411).

In *Mount Vernon*, the plaintiff asserted its claim for breach of the Good Faith Duty in a separate count. 907 A.2d at 376 (plaintiff asserted "four alternative theories in four counts: strict liability under the Maryland Commercial Code, breach of contract, negligence, and breach of the duty of good faith and fair dealing."). The Maryland court held that "breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, e.g., breach of

contract, than as a stand-alone cause of action for money damages, and we conclude that no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing." *Id.* at 381-82; *see also Magnetti v. Univ. of Maryland*, 909 A.2d 1101, 1104-05 n.3 (Md. App. 2006) ("Appellant brought contract claims alleging, in count one, breach of contract, [and] in count two, breach of the implied covenant of good faith and fair dealing," and "we note that Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing; the allegations making up such a claim should be pursued under a plaintiff's breach of contract claim."), *aff'd*, 937 A.2d 219 (Md. 2007).

Here, Plaintiffs complied with the pleading requirement identified in *Mount Vernon* and *Magnetti*, and alleged their claim for breach of the Good Faith Duty as part of their breach of contract claim in Count I (and not as a separate count). (JA074-080). Indeed, the District Court acknowledged that, in Count I, "Stockholder Plaintiffs allege that Cedar breached the Contract in *three* ways." (JA407). By dismissing Plaintiffs' claim for breach of the Good Faith Duty on the ground that there was no claim for breach of an express provision of the Articles, the District Court improperly elevated what is only a technical pleading requirement into a substantive element of the Good Faith Duty claim. In doing so, as shown in Point II.A above, the District Court committed legal error.

<p style="text-align:center">* * *</p>

For the foregoing reasons, the Court should reverse the District Court's dismissal of the Good Faith Duty claim on the ground that such a claim survives under Maryland law even in the absence of a breach of an express contractual provision. Additionally, upon such reversal, the Court may find that Plaintiffs have adequately alleged a breach of the Good Faith Duty under the weight of Maryland authority. (JA076-080) (alleging multiple indicia of bad faith). *See, e.g.*, *Clancy*, 954 A.2d at 1109 (under Maryland law, Good Faith Duty broadly obligates a party to "refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them."). Alternatively, upon reversal, the Court should remand to the District Court to determine whether Plaintiffs have adequately alleged a breach of the Good Faith Duty under Maryland law.

## III. The Complaint adequately alleges a claim against the Director Defendants for breach of fiduciary duty.

### A. The District Court ignored Maryland law when it concluded that Plaintiffs' fiduciary duty claim was superfluous.

The District Court dismissed the fiduciary duty claim against the Director Defendants in part on the ground that the "Articles expressly provide for the Stockholder Plaintiffs' rights under a merger, and thus the fiduciary duty claim is duplicative of the contract claim and must be dismissed." (JA405). In doing so, the District Court cited the Delaware Supreme Court's decision in *Nemec v. Shrader*,

991 A.2d 1120 (Del. 2010), which held that "where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim . . . [and] any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Id.* at 1129. (JA405).

But Plaintiffs' claims are governed by Maryland law. (JA402). Unlike the Delaware Supreme Court, the Maryland Supreme Court allows plaintiffs to plead fiduciary claims arising out of the same facts as contract claims. *Plank*, 231 A.3d at 466 ("a breach of fiduciary duty claim may be pleaded without limitation as to whether there is another viable cause of action to address the same conduct."). As the Seventh Circuit has explained, the "argument that Maryland does not recognize a cause of action for breach of fiduciary duty arising from a contractual relationship" is "obsolete" under the Maryland Supreme Court's decision in *Plank*. *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 849 (7th Cir. 2022); *see also id*. at 847 (under *Plank*, "a plaintiff may plead a claim for breach of fiduciary duty even when another cause of action (like breach of contract) is available to redress the conduct.").

Thus, under *Plank*, to the extent the Director Defendants breached fiduciary duties owed to Preferred Stockholders, Maryland law entitles Plaintiffs to assert a fiduciary duty claim against the Director Defendants even if that claim arose from the same set of facts as the contract claims.

**B.** **The Director Defendants breached their fiduciary duty of good faith by structuring the Transactions to enrich themselves at the expense of Preferred Stockholders.**

As the District Court recognized, directors owe fiduciary duties to preferred stockholders under Maryland law "like those owed to common stockholders." (JA404) (citing *Leviness v. Consol. Gas, Elec. Light & Power Co. of Balt.*, 80 A. 304, 306 (Md. 1911) ("The preferred stockholder . . . is expressly invested with all the incidents, rights, privileges, immunities and liabilities of a stockholder.").

Section 2-405.1(c) of the Maryland Corporation Law is "the 'sole source' of directors' duties to the corporation and its stockholders." *Eastland Food Corp. v. Mekhaya*, 301 A.3d 308, 323 (Md. 2023); *see* annexed Statutory Addendum. The statute imposes fiduciary duties of care, loyalty and good faith on the directors of Maryland corporations in favor of stockholders. *See Zucker, Tr. of Anita G. Zucker Tr. Dated Apr. 4, 2007, as Subsequently Amended or Restated v. Bowl Am., Inc.*, 2022 WL 1720151, at \*7, 9-10 (D. Md. May 27, 2022) (analyzing claims for breaches of duty of loyalty, care and good faith under Section 2-405.1).

To define the scope of misconduct constituting a breach of the fiduciary duty of good faith, Maryland courts look to Delaware law. *See Zucker*, 2022 WL 1720151, at \*10 (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)). In *Walt Disney*, the Delaware Supreme Court explained that "fiduciary conduct motivated by an actual intent to do harm . . . constitutes classic,

45

quintessential bad faith." 906 A.2d at 64. Such bad faith encompasses "the conscious doing of a wrong because of dishonest purpose . . . it contemplates a state of mind affirmatively operating with furtive design," as well as an "intentional disregard of shareholder interests." *Id.* at 64 n.102, at 67 n.111.

Here, the conflicted Director Defendants plainly crossed the line into bad faith under *Walt Disney* by structuring the Transactions with the intent of enriching themselves at the expense of Preferred Stockholders—a view corroborated by the Raymond James analyst who opined that sending the Preferred Stockholders to "purgatory" was the "driving factor behind the deal structure." (JA066, JA383).

"Purgatory" is the right word. The Transactions dramatically transformed Cedar from a publicly-traded company with a 52-property portfolio into a wholly-owned subsidiary of Wheeler with a much smaller asset base of less desirable properties—a shell of its former self. Well aware of Wheeler's history of dismal financial performance, management dysfunction, and preferred shareholder oppression, the Director Defendants unquestionably knew this restructuring would sharply raise the risk profile of the Preferred Stock, immediately crash Preferred Stock prices, and devastate Preferred Stockholders. (JA025-026). The Director Defendants proceeded anyway, willfully disregarding the foreseeably disastrous consequences to Preferred Stockholders.

Moreover, beyond just devastating Preferred Stockholders, the crash in the Preferred Stock prices positioned Wheeler to eliminate the Liquidation Preference at a cost well below $161.3 million, and acquire the Wheeler Properties at a discount to their fair market value (a "homerun/grand slam deal" for Wheeler as one Preferred Stockholder put it; JA069). Wheeler returned the favor by borrowing against the Wheeler Properties to finance a $130 million distribution paid exclusively to the Director Defendants and other Common Stockholders. (JA023, JA061-063, JA076). Preferred Stockholders received nothing. Worse, the $130 million payout left the Wheeler Properties with insufficient equity to cover the Liquidation Preference that Wheeler had agreed to assume as part of the Transactions. (JA076-077). The Director Defendants then furtively sought to conceal this deficit by lying about the value of the Wheeler Properties in Cedar's public filings. (JA067-068, JA076).

Although the Director Defendants hailed the Transactions as "the best possible outcome for our *common* shareholders" (JA067), they took no steps to protect the interests of the Preferred Stockholders. Despite their substantial personal financial interest in the Transactions, the Director Defendants failed to appoint an independent committee to advocate for the interests of Preferred Stockholders during the sales process. (JA059). In fact, the Directors Defendants never even bothered to obtain a fairness opinion with respect to the Preferred Stockholders, even though they commissioned one for the Common Stockholders. (JA059).

These allegations clearly suffice at the pleading stage to support a claim for breach of the fiduciary duty of good faith against the Director Defendants under *Walt Disney* (adopted in *Zucker* as Maryland law).

> ### C. The District Court erred when it held that the Director Defendants were obligated to maximize value for Common Stockholders at the expense of Preferred Stockholders.

The District Court acknowledged that (i) the Director Defendants owed fiduciary duties to Preferred Stockholders (JA404), and (ii) "the interests of the preferred and common stockholders were at odds during the merger." (JA406). Nevertheless, repeatedly citing the Delaware Chancery Court's decision in *LC Capital*, the District Court ruled that (i) when the interests of the preferred and common stockholders are at odds, the board must typically honor its obligations to the common stockholders" (JA405), and thus (ii) the "Director Defendants owed a duty to maximize the company's value to the common" at the expense of Preferred Stockholders in connection with the Transactions. (JA406).

The District Court's reliance on *LC Capital* was misplaced. *First*, the Maryland Supreme Court would not follow *LC Capital* to the extent it holds that a board does not owe fiduciary duties to preferred stockholders so long as the board honors the contractual rights of such stockholders. *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 449 (Del. Ch. 2010). As shown, Maryland law entitles plaintiffs to pursue an independent claim for breach of fiduciary based on the same

facts underlying any contractual claim. *See* Point III.A *supra.* Here, Plaintiffs adequately allege an independent claim against the Director Defendants for breach of the fiduciary duty of good faith under Maryland law. *See* Point III.B *supra.*

*Second*, even as a matter of Delaware law, *LC Capital* is distinguishable. In *LC Capital*, Section 7 of the governing preferred stock certificate—like Section 7 of the Articles here—granted preferred stockholders a conversion right; namely, to "convert their preferred shares into common shares" in the event of a merger, and "then to receive the same consideration as the common stock received in the merger." *LC Capital*, 990 A.2d at 439. Crucially—unlike here—the buyer in *LC Capital* fully honored that conversion right by paying preferred stockholders the same consideration being paid to common stockholders based on the conversion formula in the certificate. *Id.*

Even though the buyer was honoring their conversion right, the preferred stockholders in *LC Capital* demanded an even higher payout, and argued that the board breached a fiduciary duty when it failed to allocate more consideration to preferred stockholders. *Id.* at 445. The Chancery Court rejected this claim on the ground that where a certificate provides "the preferred with a contractual right to certain treatment in a merger," and the board honors "the special contractual rights of the preferred," there is no fiduciary duty to allocate more consideration to the preferred beyond than provided for under the certificate. *Id.* at 438; *see also id.* at

448–49 ("When, by contract, the rights of the preferred in a particular transactional context are articulated, it is those rights that the board must honor. *To the extent that the board does so*, it need not go further and extend some unspecified fiduciary beneficence on the preferred at the expense of the common.").

Here, if the Director Defendants had honored the Conversion Right or the Liquidation Preference, *LC Capital* would limit the payout to Preferred Stockholders to the sum dictated by the Conversion Right or Liquidation Preference. Instead, beset by conflicts, the Director Defendants decided that the Transactions did not trigger the Conversion Right or the Liquidation Preference, and therefore—unlike in *LC Capital*—Preferred Stockholders did not receive any distribution at all. Nor did the Director Defendants mitigate their conflict by appointing an independent agent to advocate for the interests of Preferred Stockholders. Preferred Stockholders were thus left "in an exposed and vulnerable position vis-à-vis the board of directors" (*LC Capital*, 990 A.2d at 448) without any contractual right to protect them in connection with the Transactions.

Under such circumstances, *LC Capital* obligated the Director Defendants to "do [their] best to fairly reconcile the competing interests of the common and preferred." 990 A.2d at 449. Instead, the Director Defendants took full advantage of Preferred Stockholders by concocting a convoluted deal structure that (i) distributed *all* of the proceeds from the Transactions exclusively to Common Stockholders

(Facts-A.2 above), (ii) crashed the price of the Preferred Stock (Facts-A.3 above); and (iii) left insufficient equity in the Wheeler Properties to cover the Liquidation Preference. (Facts-A.4 above). *Cf. LC Capital*, 990 A.2d at 446 ("After reviewing the evidence, I perceive no basis to find that the directors sought to advantage the common stockholders at the unfair expense of the preferred stockholders.").

The District Court cited two other Delaware cases (JA405), but neither warranted dismissal of the fiduciary duty claim. In *Poling*, *supra,* the question of law was whether the Maryland corporate statute authorized the target corporation to convert its preferred stock into cash to effectuate the merger. 2016 WL 1749803, at *3-6. That issue has no relevance here. Moreover, in *Poling*, the buyer agreed to pay $25.00 in cash per share of preferred stock in connection with the merger. *Id.* at *1. Here, in contrast, the Director Defendants took the position that neither the Liquidation Preference nor the Conversion Right applied, and did not distribute any proceeds at all to Preferred Stockholders.

Similarly, in *Equity-Linked Invs., L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997), the case was "presented, not as a preferred stock case, but as a '*Revlon*, case;" namely, whether the board secured the best deal for all stockholders. *Id.* at 1042-43. That issue also has no relevance here. Further, in *Equity-Linked*, the board kept preferred stockholders informed and afforded them ample opportunity to pitch their proposals to the board. *Id.* at 1045-51 (detailing preferred stockholder proposals and

meetings between board and its advisors and preferred stockholders). Here, in contrast, the Director Defendants did not provide Preferred Stockholders with any mechanism to advocate for their interests, and instead consigned the Preferred Stockholders to "purgatory."

<p style="text-align:center">* * *</p>

For the foregoing reasons, the Court should reverse dismissal of the fiduciary duty claim.

## IV. The Complaint adequately alleges claims against Wheeler for tortious interference with contractual rights and aiding and abetting a breach of fiduciary duty.

Since the Court should reverse dismissal of Plaintiffs' claims for breach of contract against Cedar and breach of fiduciary duty against the Director Defendants—and those dismissals formed the basis for the District Court's dismissal of the claims against Wheeler (JA412-413)—the Court should also reverse dismissal of the claims against Wheeler for tortious interference with contractual rights, and aiding and abetting a breach of fiduciary duty. *See Eastern Shore*, 213 F.3d at 185 (having recognized a potential claim for breach of the Good Faith Duty, claim for tortious interference was legally sufficient and dismissal should be reversed).

# CONCLUSION

Plaintiffs respectfully ask the Court to:

(i) reverse dismissal of Plaintiffs' claim against Cedar for breach of Section 7 of the Articles, and either (1) find that Plaintiffs have adequately plead a claim for breach of Section 7 of the Articles as a matter of law based on Cedar's failure to honor the Conversion Right; or (2) find that the Neither/Nor Clause is ambiguous, and remand to the District Court to consider extrinsic evidence of the parties' intent (and if such evidence is inconclusive, apply the rule of *contra proferentem* against Cedar as the drafter);

(ii) reverse dismissal of Plaintiffs' claim against Cedar for breach of the Good Faith Duty implied in the Articles;

(iii) reverse dismissal of Plaintiffs' claim against the Director Defendants for breach of fiduciary duty; and

(iv) reverse dismissal of Plaintiffs' claims against Wheeler for tortious interference with contractual rights and aiding and abetting a breach of fiduciary duty.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Plaintiffs respectfully request oral argument on the ground that this appeal raises important issues concerning application of Maryland law by the federal courts to adjudication of claims for breach of contract and breach of fiduciary duty under Maryland law.

Dated: November 7, 2023

Respectfully submitted,

*/s/ Lawrence Deutsch*

**BERGER MONTAGUE PC**
Lawrence Deutsch
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3062
ldeutsch@bm.net
aabramowitz@bm.net

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
jfruchter@wohlfruchter.com

**LEVI & KORSINSKY LLP**
Donald J. Enright
1101 30th Street, NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
denright@zlk.com

**HEFFNER HURST**
Matthew Heffner
Matthew Hurst
30 North LaSalle Street, Suite 1210
Chicago, Illinois 60602
Tel: (312) 346-3466
mheffner@heffnerhurst.com
mhurst@heffnerhurst.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,310 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

<div align="right">

*/s/ Lawrence Deutsch*
Lawrence Deutsch

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 20223, I caused the foregoing brief of Plaintiffs-Appellants to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

<div align="right">

*/s/ Lawrence Deutsch*
Lawrence Deutsch

</div>

# United States Court of Appeals for the Fourth Circuit

JULIA KIM, DAVID SYDNEY, MARTIN NOVICK, J. RENEE BRENNAN LIVING TRUST, SCOTT SCHROEPFER, AND KENNETH KAMHOLZ, individually and on behalf of others similarly situated,
*Plaintiffs-Appellants,*

v.

CEDAR REALTY TRUST, INC., BRUCE J. SCHANZER, GREGG A. GONSALVES, ABE EISENSTAT, STEVEN G. ROGERS, SABRINA KANNER, DARCY D. MORRIS, RICHARD H. ROSS, SHARON STERN, CEDAR REALTY TRUST PARTNERSHIP, L.P. AND WHEELER REAL ESTATE INVESTMENT TRUST, INC.
*Defendants-Appellees*

---

Appeal from the United States District Court
for the District of Maryland at Baltimore
Case No. 22-cv-01103 (The Honorable George Levi Russell III)

---

## STATUTORY ADDENDUM

---

Matthew Heffner
Matthew Hurst
Heffner Hurst
30 North LaSalle Street, Suite 1210
Chicago, IL 60602
312-346-3466

Joshua E. Fruchter
Wohl & Fruchter LLP
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
845-290-6818

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on inside cover)*

Lawrence Deutsch
Andrew D. Abramowitz
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
215-875-3000

Donald J. Enright
Levi & Korsinsky, LLP
1101 Vermont Ave., N.W., Suite 700
Washington, DC 20005
202-524-4290

<div style="border:1px solid black; padding:1em;">

West's Annotated Code of Maryland

  Corporations and Associations

    Title 2. Corporations in General--Formation, Organization, and Operation (Refs & Annos)

      Subtitle 4. Directors and Officers (Refs & Annos)

</div>

MD Code, Corporations and Associations, § 2-405.1

# § 2-405.1. Liability of directors, standard of care

Effective: October 1, 2016

Currentness

**"Act" defined**

(a) In this section, "act" includes, as the context requires:

  (1) An act, an omission, a failure to act, or a determination made not to act; or

  (2) To act, omit to act, fail to act, or make a determination not to act.

**Application**

(b) This section applies to acts of an individual who:

  (1) Is or was a director of a corporation; and

  (2) Is acting or was acting in the individual's official capacity as a director of a corporation.

**Requirements of director**

(c) A director of a corporation shall act:

  (1) In good faith;

  (2) In a manner the director reasonably believes to be in the best interests of the corporation; and

  (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

**Reliance on information**

**1**

(d)(1) A director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by:

(i) An officer or employee of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(ii) A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or

(iii) A committee of the board on which the director does not serve, as to a matter within its designated authority, if the director reasonably believes the committee to merit confidence.

(2) A director is not acting in good faith if the director has any knowledge concerning the matter in question which would cause the reliance to be unwarranted.

### Immunity

(e) A director who acts in accordance with the standard of conduct provided in this section shall have the immunity from liability described under § 5-417 of the Courts Article.

### Actions not required

(f) The standard of conduct provided in this section does not require a director of a corporation to:

(1) Act to accept, recommend, or respond on behalf of the corporation to a proposal by an acquiring person as defined in § 3-801 of this article;

(2) Act to authorize the corporation to redeem any rights under, modify, or render inapplicable, a stockholder rights plan;

(3) Act to elect on behalf of the corporation to be subject to or refrain from electing on behalf of the corporation to be subject to any or all of the provisions of Title 3, Subtitle 8 of this article;

(4) Act to make a determination under the provisions of Title 3, Subtitle 6 or Subtitle 7 of this article; or

(5) Act solely because of:

(i) The effect the act may have on an acquisition or potential acquisition of control of the corporation; or

(ii) The amount or type of consideration that may be offered or paid to stockholders of the corporation in an acquisition or a potential acquisition of control of the corporation.

### Presumption

(g) An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section.

### Acts relating to acquisitions

(h) An act of a director of a corporation relating to or affecting an acquisition or a potential acquisition of control of the corporation or any other transaction or potential transaction involving the corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director.

### Application

(i) This section:

(1) Is the sole source of duties of a director to the corporation or the stockholders of the corporation, whether or not a decision has been made to enter into an acquisition or a potential acquisition of control of the corporation or enter into any other transaction involving the corporation; and

(2) Applies to any act of a director, including an act as a member of a committee of the board of directors.

### Credits

Added by Acts 1976, c. 567, § 4. Amended by Acts 1988, c. 3; Acts 1988, c. 4; Acts 1989, c. 236, § 2; Acts 1990, c. 546; Acts 1997, c. 14, § 20, eff. April 8, 1997; Acts 1999, c. 300, § 1, eff. June 1, 1999. Amended by Acts 2016, c. 170, § 1, eff. Oct. 1, 2016; Acts 2016, c. 171, § 1, eff. Oct. 1, 2016.

Notes of Decisions (96)

MD Code, Corporations and Associations, § 2-405.1, MD CORP & ASSNS § 2-405.1
Current with all legislation from the 2023 Regular Session of the General Assembly. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.