No. 23-1905

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

JULIA KIM, DAVID SYDNEY, MARTIN NOVICK, J. RENEE BRENNAN LIVING TRUST, SCOTT SCHROEPFER, AND KENNETH KAMHOLZ,

*Plaintiffs-Appellants*,

v.

CEDAR REALTY TRUST, INC., BRUCE J. SCHANZER, GREGG A. GONSALVES, ABE EISENSTAT, STEVEN G. ROGERS, SABRINA KANNER, DARCY D. MORRIS, RICHARD H. ROSS, SHARON STERN, CEDAR REALTY TRUST PARTNERSHIP, L.P., AND WHEELER REAL ESTATE INVESTMENT TRUST, INC.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the District of Maryland
No. 22-cv-01103 (Russell, J.)

## ANSWERING BRIEF OF APPELLEES

Jerrold A. Thrope
GORDON FEINBLATT LLC
1001 Fleet Street
Suite 700
Baltimore, MD 21202
(410) 576-4295

*Counsel for Defendants Cedar Realty Trust, Inc., Cedar Realty Trust Partnership, L.P., and Wheeler Real Estate Investment Trust, Inc.*

William M. Jay
Benjamin Hayes
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

*Counsel for the Director Defendants*

*Additional counsel listed on inside cover*

Douglas H. Flaum
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 813-8800

Jennifer Burns Luz
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
(617) 570-1000

*Counsel for the Director Defendants*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS (WHEELER REAL ESTATE INVESTMENT TRUST, INC.)**

Pursuant to FRAP 26.1 and Local Rule 26.1, Appellee Wheeler Real Estate Investment Trust, Inc. ("Wheeler") makes the following disclosure:

1.     Wheeler is a publicly held corporation.

2.     Wheeler does not have parent corporations.

3.     There is no publicly held corporation or other publicly held entity that holds more than 10% of the stock of Wheeler.

4.     There is no other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation.

5.     Wheeler is not a trade association.

6.     This case does not arise out of a bankruptcy proceeding.

7.     This is not a criminal case in which there is an organizational victim.

/s/ Jerrold A. Thrope *(by permission)*
Jerrold A. Thrope

Dated:  December 22, 2023

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS (CEDAR REALTY TRUST INC.)

Pursuant to FRAP 26.1 and Local Rule 26.1, Appellee Cedar Realty Trust, Inc. ("Cedar") makes the following disclosure:

1. Only Cedar's preferred stock is publicly traded.

2. Cedar does have parent corporations. Wheeler, a publicly traded corporation, owns Cedar except for Cedar's preferred stock.

3. Wheeler, a publicly traded corporation, owns all of Cedar's common stock. The preferred stock of Cedar is publicly traded and widely held.

4. There is no other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation.

5. Cedar is not a trade association.

6. This case does not arise out of a bankruptcy proceeding.

7. This is not a criminal case in which there is an organizational victim.

/s/ Jerrold A. Thrope *(by permission)*
Jerrold A. Thrope

Dated: December 22, 2023

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS (CEDAR REALTY TRUST PARTNERSHIP, L.P.)

Pursuant to FRAP 26.1 and Local Rule 26.1, Appellee Cedar Realty Partnership, L.P. ("Cedar Partnership") makes the following disclosure:

1.    Cedar Partnership is not a publicly held corporation or other publicly held entity.

2.    Cedar Partnership has parent corporations.  Cedar Partnership is owned by Cedar.  In turn, Cedar is owned by Wheeler.  Cedar's preferred stock is publicly traded.  Wheeler's stock is publicly traded.

3.    There is no publicly held corporation or other publicly held entity that holds more than 10% of the stock of Wheeler.

4.    There is no other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation.

5.    Cedar Partnership is not a trade association.

6.    This case does not arise out of a bankruptcy proceeding.

7.    This is not a criminal case in which there is an organizational victim.

/s/ Jerrold A. Thrope *(by permission)*
Jerrold A. Thrope

Dated:  December 22, 2023

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES.............................................................4

STATEMENT OF THE CASE.................................................................4

I.     Cedar's Preferred Stock And The Change Of Control Provision .................4

II.    The Asset Sale And Subsequent Merger With Wheeler ................................7

III.   Preferred Stockholder Plaintiffs Sued Cedar, Its Former Directors, And Wheeler....................................................................................9

IV.    The District Court Dismissed The Complaint With Prejudice.....................11

SUMMARY OF ARGUMENT .................................................................13

STANDARD OF REVIEW .......................................................................16

ARGUMENT ...............................................................................................17

I.     The Merger Was Not A Change Of Control That Triggered Preferred Stockholders' Conversion Rights. ...........................................17

       A.    A Change of Control Does Not Occur If Either Cedar Or The Entity That Obtained Ownership Of It Has Publicly Traded Common Stock. ...............................................................................18

       B.    The Merger Was Not A Change Of Control Even Under Plaintiffs' Framing Of The Definition. .................................................21

             1.    If The Corporation, The Acquiring Entity, Or The Surviving Entity Has Publicly Traded Common Stock, No Change Of Control Occurs.................................................21

             2.    Plaintiffs' Contrary Arguments Are Meritless. .......................24

II.    The Complaint Fails To Plausibly Allege A Breach Of The Implied Covenant Of Good Faith And Fair Dealing. .................................31

       A.    The Complaint's Allegations Fall Far Outside The Narrow Scope Of The Implied Covenant Under Maryland Law. ...................32

       B.    The Complaint Fails To Allege A Breach Of The Implied Covenant Even If Plaintiffs' Expansive View Of The Covenant Were Accurate. .................................................................35

III.   The Fiduciary Duty Claim Was Properly Dismissed. ...................................37

A. The Directors Owed Preferred Stockholders No Fiduciary Duties With Respect To Preferred Stockholders' Contractual Rights...................................................................................38

B. Even If The Directors Owed Preferred Stockholders Fiduciary Duties, The Complaint Fails To Allege A Violation Of Those Duties..................................................................................42

 1. The Complaint Fails To Allege The Directors Breached Any Duty Of Good Faith. ........................................43

 2. Plaintiffs Have Both Abandoned And Failed To Plead Any Claim For Breach Of The Duty Of Loyalty....................46

IV. The Claims Against Wheeler Were Properly Dismissed. ...........................49

 A. Plaintiffs Have Failed To Plausibly Allege A Tortious Interference Claim Against Wheeler................................................49

  1. Plaintiffs Have Not Alleged A Breach Of Contract. ..............50

  2. Plaintiffs Have Not Alleged Any Tortious Conduct By Wheeler. ...................................................................50

 B. Plaintiffs Have Failed To Plausibly Allege That Wheeler Aided And Abetted A Breach Of Fiduciary Duty By Cedar. ......................52

  1. Plaintiffs Have Not Alleged A Breach Of Fiduciary Duty......52

  2. Plaintiffs Have Not Alleged Any Tortious Conduct By Wheeler. ...................................................................53

CONCLUSION .......................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*,
665 A.2d 1038 (Md. 1995) .................................................................52

*Anand v. Ocwen Loan Servicing, LLC*,
754 F.3d 195 (4th Cir. 2014) ............................................................47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................17, 18, 52

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................16, 17

*Blondell v. Littlepage*,
968 A.2d 678 (Md. Ct. Spec. App. 2009),
*aff'd*, 991 A.2d 80 (Md. 2010).......................................................50

*Blondell v. Littlepage*,
991 A.2d 80 (Md. 2010) ..................................................3, 14, 32, 35

*Boland v. Boland*,
31 A.3d 529 (Md. 2011) ...................................................................47

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
80 F.4th 466 (4th Cir. 2023) ............................................................16

*Clancy v. King*,
954 A.2d 1092 (Md. 2008) .............................................................33, 34

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
56 A.3d 170 (Md. 2012) .................................................................32, 33

*Credible Behav. Health, Inc. v. Johnson*,
220 A.3d 303 (Md. 2019) ................................................................27

*Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*,
213 F.3d 175 (4th Cir. 2000) .........................................................34, 35

*Eastland Food Corp. v. Mekhaya*,
    301 A.3d 308 (Md. 2023) ...................................................................42

*Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*,
    264 F.3d 424 (4th Cir. 2001) ...............................................14, 32, 33

*In re Essendant, Inc. S'holder Litig.*,
    2019 WL 7290944 (Del. Ch. Dec. 30, 2019).....................................46

*Evanto v. Fed. Nat. Mortg. Ass'n*,
    814 F.3d 1295 (11th Cir. 2016) .........................................................19

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
    2017 WL 1437308 (Del. Ch. Apr. 14, 2017).....................................39

*Gagliardi v. TriFoods Int'l, Inc.*,
    683 A.2d 1049 (Del. Ch. 1996) .........................................................43

*Greenhouse v. MCG Cap. Corp.*,
    392 F.3d 650 (4th Cir. 2004) ............................................................32

*Jedwab v. MGM Grand Hotels, Inc.*,
    509 A.2d 584 (Del. Ch. 1986) ..........................................................38

*Jolly Roger Fund, LP v. Prime Grp., Realty Tr.*,
    2007 WL 3237447 (Md. Cir. Ct. Aug. 16, 2007).............................39

*K&D Holdings, LLC v. Equitrans, L.P.*,
    812 F.3d 333 (4th Cir. 2015) ............................................................27

*Korman v. Walking Co.*,
    503 F. Supp. 2d 755 (E.D. Pa. 2007).........................................23, 24

*LC Capital Master Fund, Ltd. v. James*,
    990 A.2d 435 (Del. Ch. 2010) ........................... 15, 38, 40, 41, 42, 44, 46, 48, 49

*Macklin v. Robert Logan Assocs.*,
    639 A.2d 112 (Md. 1994) ..................................................................50

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) .....................................................................45

*Malpiede v Townson*,
780 A.2d 1075 (Del. 2001) ...................................................53

*Meyer v. CUNA Mutual Insurance Society*,
648 F.3d 154 (3d Cir. 2011) ...........................................26, 27

*Middlebrook Tech, LLC v. Moore*,
849 A.2d 63 (Md. Ct. Spec. App. 2004)........................20, 26

*Morgan v. Cash*,
2010 WL 2803746 (Del. Ch. July 16, 2010) ......................53

*Mount Vernon Props. LLC v. Branch Banking & Trust Co.*,
907 A.2d 373 (Md. Ct. Spec. App. 2006)............................37

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)...............................................................19

*Oliveira v. Sugarman*,
152 A.3d 728 (Md. 2017) .....................................................37

*Painter's Mill Grille, LLC v. Brown*,
716 F.3d 342 (4th Cir. 2013) ...............................................51

*Plank v. Cherneski*,
231 A.3d 436 (Md. 2020) ............................20, 27, 40, 41

*Planned Parenthood of Middle Tenn. v. Sundquist*,
1998 WL 467110 (Tenn. Ct. App. Aug. 12, 1998)............28

*Poling v. CapLease, Inc.*,
2015 WL 13309114 (Md. Cir. Ct. May 13, 2015),
*aff'd*, 2016 WL 1749803 (Md. Ct. Spec. App. May 3, 2016) ...........................39

*Poling v. CapLease, Inc.*,
2016 WL 1749803 (Md. Ct. Spec. App. May 3, 2016) ................30, 38

*Precision Small Engines, Inc. v. City of College Park*,
179 A.3d 1019 (Md. 2018) .............................................18, 31

*Questar Builders, Inc. v CN Flooring, LLC*,
978 A.2d 651 (Md. 2009) ...............................................33, 34

*Ryan v. Buckeye Partners, L.P.*,
2022 WL 389827 (Del. Ch. Feb. 9, 2022) ........................................51

*Shenker v Laureate Educ., Inc.*,
983 A.2d 408 (Md. 2009) .................................................................53

*SouthTrust Bank v. Copeland One, LLC*,
886 So.2d 38 (Ala. 2003) .................................................................27

*Sutton v FedFirst Fin. Corp.*,
126 A.3d 765 (Md. Ct. Spec. App. 2015) .........................................53

*In re Trados Inc. Shareholder Litig.*,
73 A.3d 17 (Del. Ch. 2013) ..............................................................42

*United Parcel Service v. Strothers*,
286 A.3d 23 (Md. 2022) ...................................................................27

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
782 F.3d 671 (Fed. Cir. 2015) .........................................................23

*In re Walt Disney Co. Derivative Litig.*,
906 A.2d 27 (Del. 2006) ...................................................................44

*Werbowsky v. Collomb*,
766 A.2d 123 (Md. 2001) .................................................................43

*Zucker v. Bowl Am., Inc.*,
2022 WL 1720151 (D. Md. May 27, 2022) ...............................43, 47

**Statute:**

Md. Code Ann., Corps. & Ass'ns § 2-405.1 .........................................42

**Books and Treatises:**

Irving M. Copi, et al., *Introduction to Logic* (12th ed. 2005) ..........22, 23

*Fletcher Cyclopedia of the Law of Corporations* § 5283 (2023) .............5

Bryan A. Garner, *Garner's Modern English Usage* (4th ed. 2016) .......19, 25

Restatement (Second) of Torts § 767 (1979) .........................................50

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012)..............................22, 23

**Dictionaries:**

Merriam-Webster's Collegiate Dictionary (11th ed. 2020)....................................26

The Merriam-Webster Dictionary (2016)................................................................22

Webster's New World College Dictionary (5th ed. 2016) .....................................22

Webster's Third New International Dictionary (1986) .....................................22, 26

# INTRODUCTION

Plaintiffs chose to buy preferred stock, which prioritize the stockholders' right to regular cash dividends over voting power. Preferred stockholders' rights were set out in black and white in the relevant corporate document, the Articles Supplementary (the "Articles"). Relevant here, the Articles expressly recognize that the preferred stockholders might remain with the company even after a merger; they only had the right to convert to common stock in the event of a "Change of Control" (a defined term) that left neither the company nor the acquirer with publicly traded stock. That did not happen here. The essence of Plaintiffs' complaint is that they are unhappy with the express terms of their preferred stock: they did not get to convert to common stock, *because* the company did not undergo a Change of Control to a privately held company, and they did not get a liquidation preference, *because* the company did not liquidate. As the district court recognized, Plaintiffs continue to receive all the rights the Articles guarantee them, especially the dividend rights that common stockholders do not enjoy. Plaintiffs' attempt to demand rights beyond the Articles fails to state a claim.

Cedar Realty Trust, Inc. ("Cedar") is a Maryland corporation that focuses on the ownership, operation, and redevelopment of shopping centers. For years, Cedar's common stock traded at a significant discount relative to the net asset value of its real estate portfolio. So Cedar's then-Board of Directors (the "Directors")

1

unanimously recommended, and 99% of Cedar's common stockholders approved, two separate transactions. First, Cedar sold a substantial portion of its properties to a third party. Second, Wheeler Real Estate Investment Trust, Inc. ("Wheeler"), a publicly traded company, acquired Cedar as a subsidiary, by paying cash for Cedar's common stock. Cedar's preferred stock remains publicly traded and is entitled to the same rights and payment of the same dividend as before the merger.

Displeased with the terms of the merger, several of Cedar's preferred stockholders filed this putative class action against Cedar, its former Directors, and Wheeler. After rejecting Plaintiffs' attempt to enjoin the transactions, the district court granted Defendants' motions to dismiss.

This Court should affirm. The Complaint fails to establish that the merger violated any provision of the Articles, whether an express term or one implied by law, by not converting preferred stock into common stock. The merger involved no Change of Control, which occurs only if "*neither* the Corporation [Cedar] *nor* the acquiring or surviving entity" has publicly traded common stock. J.A.341 (emphasis added). Wheeler, the acquirer, *does* have publicly traded common stock; therefore, Plaintiffs had no right to convert. Their claim to an express right depends on an illogical reading of the conjunction "or" to justify disregarding Wheeler's publicly traded stock. Their claim to an unwritten right based on the *implied* covenant of good faith and fair dealing is foreclosed by settled Maryland precedent holding that

2

the implied covenant "does not obligate a party to take affirmative actions that the party is clearly not required to take under the contract." *Blondell v. Littlepage,* 991 A.2d 80, 90 (Md. 2010) (brackets omitted). Plaintiffs are demanding a conversion right the Articles did not give them.

Nor can Plaintiffs state a claim for breach of fiduciary duty. When preferred stockholders invoke a right arising from contract, they are not owed any fiduciary duties; their rights are expressly limited to their agreement. Plaintiffs invested knowing the rights (especially the dividend) and risks that accompany preferred stock; there is no fiduciary obligation to give them a non-contractual right to convert to a different kind of stock with a different bundle of rights and risks. And nothing in the Complaint rebuts the presumption that the fiduciaries acted in Cedar's best interest. Stripped of hyperbolic rhetoric, the Complaint merely alleges that the Directors acted to maximize the value of the company. It nowhere alleges the Directors *intended* to harm preferred stockholders or engaged in self-dealing.

The tortious interference and aiding and abetting claims against Wheeler depend on the breach of contract and fiduciary duty claims, so they fail for the same reasons. In addition, dismissal of each claim can be affirmed because the Complaint fails to allege any tortious or improper conduct by Wheeler. At most, the Complaint alleges that Wheeler engaged in an arm's-length deal with Cedar that was in the best interests of Wheeler; that is insufficient as a matter of law.

## STATEMENT OF THE ISSUES

1.     Whether the Complaint plausibly alleges that Cedar breached an express term of the Articles, or an implied duty of good faith and fair dealing, by approving the merger without providing for the conversion of preferred stock into common stock, a conversion that under the Articles occurs only after a Change of Control.

2.     Whether the Complaint plausibly alleges the Directors breached any fiduciary duty owed to preferred stockholders by approving the merger without providing for the conversion of preferred stock into common stock.

3.     Whether the Complaint plausibly alleges a tortious interference claim against Wheeler.

4.     Whether the Complaint plausibly alleges a claim for aiding and abetting a breach of fiduciary duty against Wheeler.

## STATEMENT OF THE CASE

### I.    Cedar's Preferred Stock And The Change Of Control Provision

Cedar is a Maryland corporation taxed as a real estate investment trust. In the transaction at issue, Cedar was acquired by Wheeler, a public company traded on the NASDAQ exchange, and became a wholly owned subsidiary. J.A.23; J.A.32; J.A.46; J.A.63. Until that acquisition, Cedar had a series of common stock that was publicly traded. J.A.38. Cedar's Board was composed of eight Directors, who were

elected by Cedar's common stockholders. J.A.33-36. Each Director owned Cedar common stock. J.A.33-35.

Cedar also had, and still has, two classes of outstanding preferred stock that are publicly traded. Preferred stock, in contrast to common stock, is a class of stock "that has a preference over common stock, typically respecting dividends and liquidation," but usually "at most only limited voting rights." 11 *Fletcher Cyclopedia of the Law of Corporations* § 5283 (2023). The rights of Cedar's preferred stockholders are provided for in the Articles. J.A.39; *see* J.A.336-352. And the Articles cannot be amended without the vote of two-thirds of the preferred stockholders. J.A.342.

Cedar's preferred stockholders have a robust right to dividends. J.A.337-338. Even if Cedar does not have money to pay dividends, the preferred stockholders' right to dividends cumulates and remains protected; for example, it must be satisfied before common stockholders are paid in any liquidation. J.A.338; J.A.339; J.A.342.

Conversely, preferred stockholders "shall not have any voting rights, except as set forth" in the Articles. J.A.342. Notably, preferred stockholders may sometimes have a right to vote on a merger, but *not* if the preferred stock "remains outstanding with the terms thereof materially unchanged," or "is exchanged for a security of the surviving entity [in the merger] with terms that are materially the same." J.A.343. Thus, the Articles make plain that, in a merger in which Cedar

survives or merges into another public company, preferred stockholders' primary right is to retain their shares on the same terms—no more. And, as the Prospectus offering the preferred stock made clear, "the market value of [] Preferred Stock" could be "materially adversely affected" after a transaction, such as a merger, in which Cedar's common stock is delisted. S.A.9 (Prospectus at S-12).[1]

The Articles give preferred stockholders a limited "[r]ight … to convert some or all of [their] Preferred Stock … into a number of shares of Common Stock." J.A.343. That right may be exercised only "[u]pon the occurrence of a Change of Control," J.A.343—a defined term that applies *only* if Cedar ceases to be a public company or part of one. Relevant here, a Change of Control occurs only if two conditions (denominated "(x)" and "(y)" in the Articles) "have occurred and are continuing." J.A.341. First, a third party must obtain "beneficial ownership" of "more than 50% of the total voting power" of Cedar's stock through some form of transaction or series of transactions, whether a purchase, merger, or something else:

> (x) the acquisition by any person …, of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors ….

---

[1] The Prospectus is judicially noticeable, was filed in the consolidated case below (No. 8:22-cv-1142, ECF No. 30-4), and is cited in the Complaint (J.A.44 n.9). Defendants have moved to submit a supplemental appendix ("S.A.") containing it.

J.A.341.  Second, after the "closing of any [such] transaction," neither of the post-transaction entities—Cedar or the entity that obtained ownership of 50% or more of its voting stock—may have publicly traded common stock:

> (y) following the closing of any transaction referred to in clause (x), *neither* the Corporation *nor* the acquiring or surviving entity has a class of common securities … listed on the New York Stock Exchange [or two other national exchanges] ….

J.A.341 (emphasis added).[2]

In sum, a Change of Control occurs only if (1) there has been a literal change of control through the acquisition of majority ownership, *and* (2) neither Cedar nor the entity that acquired Cedar has publicly traded common stock.

## II.   The Asset Sale And Subsequent Merger With Wheeler

Cedar's acquisition by Wheeler was the culmination of the Directors' years-long process aimed at maximizing value for Cedar's stockholders.  From at least 2018, Cedar's stock had traded substantially below the net asset value of its real estate portfolio.  J.A.128.  As a result, Cedar and the Directors periodically explored whether Cedar should engage in a strategic transaction and/or sell portions of its asset portfolio to maximize stockholder value.  J.A.128.  To attract an array of potential bidders and thereby maximize potential value, Cedar followed a "dual-

---

[2] This Change of Control language is standard for real estate investment trusts.  *See* 6A Securities Regulation Forms § 7:57 (2023).  An alternative definition (clause (z), J.A.341) is not at issue here.

track" process of soliciting both offers to buy Cedar as a whole, and offers to buy discrete groups of its properties. J.A.55-56; J.A.131-132. After publicly disclosing this process, Cedar engaged with 55 potential counterparties and ultimately received multiple preliminary and final proposals to acquire (1) the whole company, (2) certain assets of the company, or (3) the company following a prior asset sale. J.A.56-57; J.A.132-135.

In considering the competing proposals, the Directors noted that a whole-company offer would result in a lower valuation for Cedar and thus provide less value to Cedar's common stockholders than the alternative structures. J.A.135. Conversely, a "sum of the parts" series of transactions with separate parties offered greater aggregate value for the company and its common stockholders, but posed greater execution risk than a single, whole-company transaction. J.A.135. Ultimately, the Directors approved two transactions—an asset sale and a subsequent merger (the "Transactions"). J.A.59; J.A.138-139.

First, Cedar agreed to sell a portfolio of 33 grocery-anchored properties for a cash price of $840 million (the "Asset Sale"). J.A.57. Second, following the Asset Sale and distribution of the net proceeds to its common stockholders, Cedar agreed to engage in an all-cash reverse merger with Wheeler that valued Cedar and its remaining assets at $291.3 million (the "Merger"). J.A.57-58; J.A.168. After the Merger, Cedar would survive as a wholly owned subsidiary of Wheeler with a

portfolio consisting of its remaining assets. J.A.63-64; J.A.168. Among other things, Cedar's Board based its approval and recommendation on (1) an opinion from its financial advisor that the aggregate consideration to be received by the common stockholders from the Transactions was fair, and (2) confirmation that the party that had submitted the whole-company offer had declined to increase its per-share offer price, meaning that the value of that transaction remained significantly below the "sum-of-the-parts" transactions that the Directors approved. J.A.59; J.A.138-141.

More than 99% of Cedar's voting common stockholders voted to approve the Transactions. J.A.59; J.A.105-106. Following the Asset Sale, Wheeler acquired Cedar's common stock in a reverse cash out merger. J.A.60. Preferred shares, by contrast, remain outstanding and publicly traded. J.A.61. Preferred stockholders continue to be entitled to the same substantial dividend as before the Transactions under the same terms specified in the Articles. J.A.337-338.

## III. Preferred Stockholder Plaintiffs Sued Cedar, Its Former Directors, And Wheeler.

Plaintiffs are holders of Cedar preferred stock who have filed this putative class-action lawsuit against Cedar, its former Directors, and Wheeler, to recover damages allegedly incurred as a result of the Transactions. J.A.20-83.

Plaintiffs alleged one cause of action against Cedar and the Directors and a second against the Directors alone. *First*, the Complaint alleges that Cedar and the

Directors breached the Articles by entering into the Merger on terms that did not allow Plaintiffs to convert their preferred stock into common stock. J.A.75. According to the Complaint, the Merger qualified as a Change of Control that triggered Plaintiffs' conversion right. J.A.43-44. Plaintiffs also allege that Cedar and the Directors breached the implied duty of good faith and fair dealing under Maryland law by allegedly "exercising their discretion in bad faith" and "deliberately structuring the Transactions with the intent of injuring Preferred Stockholders and depriving them of the fruits of the Articles Supplementary." J.A.76; *see* J.A.75-80. *Second*, the Complaint asserts a claim against the Directors for breach of fiduciary duties allegedly owed to preferred stockholders, based on the same allegations of "bad faith" and "deliberate[] … intent [to] injur[e]" underlying the good-faith-and-fair-dealing theory. J.A.80-81.

The Complaint asserts two causes of action against Wheeler. *First*, Plaintiffs allege that Wheeler tortiously interfered with Plaintiffs' contractual rights under the Articles by "cooperat[ing] with the Cedar Defendants to structure the Transactions" to deprive Plaintiffs of their contractual rights, including their conversion rights. J.A.81. *Second*, the Complaint alleges that Wheeler's cooperation with the Directors in entering into the Transactions aided and abetted those defendants' alleged breach of their fiduciary duties. J.A.82.

**IV.    The District Court Dismissed The Complaint With Prejudice.**

The district court dismissed the Complaint with prejudice.  J.A.395-416 & n.8.

The court first dismissed the breach of contract claim against the Directors because they "are not parties to the Articles," and "under Maryland law, 'a person cannot be held liable under a contract to which he was not a party.'"  J.A.403.  As the court noted, "Plaintiffs [had] ma[d]e no argument to the contrary" and thus "seemingly concede[d] the point."  J.A.403.[3]

The court then dismissed the breach of fiduciary duty claim.  The court recognized that although a "board generally owes [preferred stockholders] fiduciary duties like those owed to common stockholders," the "'preferred stock's preferential rights … are defined by contract … and can include a broad range of terms and conditions.'"  J.A.404 (quoting *Poling v. CapLease, Inc.*, 2016 WL 1749803, at *3 (Md. Ct. Spec. App. May 3, 2016)).  Thus, under Maryland law, "when the contract expressly provides rights to preferred shareholders, additional 'preferences and limitations will not be presumed or implied.'"  J.A.404 (quoting *Poling*, 2016 WL 1749803, at *3); J.A.405.  Applying these principles, the court concluded that the Articles "do[] not provide for any fiduciary duties related to mergers," and "therefore

---

[3] Plaintiffs have not challenged this component of the district court's order.

the Court cannot impute any additional, unwritten responsibilities onto [the] Directors." J.A.405-406.

The court then granted Cedar's and Wheeler's motion to dismiss the breach of contract, tortious interference, and aiding and abetting claims. J.A.408-414. On the breach of contract claim, the court held that the Merger was not a Change of Control triggering preferred stockholders' conversion rights because the second condition in the Change of Control definition (clause (y)) was not satisfied: "the language of the [Articles] clearly and unambiguously means that both Wheeler and Cedar cannot have publicly traded stock for a change of control to occur." J.A.410-411. Because both parties "agree[d] that Wheeler's common stock is publicly traded," there was no Change of Control and no breach. J.A.410-411.[4] The court then rejected Plaintiffs' alternative theory premised on an alleged breach of an implied covenant of good faith and fair dealing. J.A.411-412.

Finally, the district court dismissed the tortious interference and aiding and abetting claims against Wheeler because those claims were dependent on the survival of the breach of contract and fiduciary duty claims. J.A.412-413.

---

[4] The court also rejected Plaintiffs' separate argument that Cedar and the Directors breached the Articles by not paying preferred stockholders the liquidation preference. J.A.75-76; J.A.408-410. Plaintiffs have not challenged that ruling on appeal.

## SUMMARY OF ARGUMENT

The Court should affirm the judgment in full.

I.    The district court correctly dismissed the breach of contract claim premised on breach of an express provision of the Articles, because the Transactions did not constitute a Change of Control under any plausible interpretation of that definition.

A Change of Control occurs only if "neither the [Company] nor the acquiring or surviving entity has [publicly traded common stock]." J.A.341. Basic rules of grammar and the surrounding context show that this language unambiguously identifies only two entities—Cedar (the Company) and "*the* acquiring or surviving *entity*" that obtains ownership of it. Here, "the acquiring or surviving entity" is Wheeler, which still has publicly traded common stock, so the Merger was not a Change of Control.

That same conclusion would follow even if the definition were read to refer to three separate entities—the Corporation (Cedar), an acquiring entity (Wheeler), and a separate surviving entity (again, Cedar). A sentence saying *"neither x nor y or z"* is logically equivalent to a sentence saying *"not x and not y and not z."* That is even clearer where the "or" is used to shorten parallel language: "neither Virginia nor North or South Carolina" means none of the three states. Thus, the contract's language conditioning a Change of Control on *"neither [Cedar] nor [Wheeler] or*

*[Cedar]"* having publicly traded common stock requires that *none of* those three entities have publicly traded common stock—but Wheeler does.

II.    The Court should affirm dismissal of the breach of contract claim premised on a violation of the implied covenant of good faith and fair dealing.

A.    Under Maryland law, the implied covenant of good faith and fair dealing is limited to barring one party from preventing the other from performing its contractual obligations. *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 444 (4th Cir. 2001). The Complaint does not allege that Cedar interfered with the preferred stockholders' own performance.

B.    Even if the implied covenant more broadly prohibited depriving a counterparty of the "fruits of the contract," Opening Br. 38, dismissal is still warranted. The implied covenant "does not obligate a party to take affirmative actions the party is clearly not required to take under the contract." *Blondell*, 991 A.2d at 90 (brackets omitted). The Complaint's theory of breach violates this rule: the Transactions satisfied all written obligations to preferred stockholders and were not required to also meet some additional, abstract standard of fairness.

III.    The Court should affirm dismissal of the claim against the Directors for breach of fiduciary duty for either of two independent reasons.

A.    Under longstanding precedent, where a contract specifies the rights of and duties owed to preferred stockholders in the context of a particular transaction,

the contract alone defines the board's obligations to preferred stockholders. *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 448-49 (Del. Ch. 2010). Here, Plaintiffs allege that the Directors violated fiduciary obligations by not structuring the contracts to trigger preferred stockholders' conversion rights, but the Articles squarely address the circumstances under which preferred stockholders are entitled to convert their shares. Therefore, the Articles alone govern.

B.    Even if the Directors did owe preferred stockholders fiduciary obligations, the Complaint fails to plausibly allege that the Directors breached any such duty.

*First*, the Complaint fails to allege the Directors breached any fiduciary duty of good faith—the only fiduciary duty mentioned in the Opening Brief. The Complaint lacks any plausible allegations that the Directors intended to harm the preferred stockholders. Instead, stripped of pejorative rhetoric, Plaintiffs merely allege the Directors approved the Merger because they believed it was in Cedar's best interest, consistent with their duty of care.

*Second*, even if Plaintiffs had preserved an argument that the Directors breached a fiduciary duty of loyalty, the Complaint lacks any plausible allegations of self-interest or self-dealing. The Complaint tries to paint the Directors' actions as suspect because they owned common stock (not preferred stock), but the Complaint fails to allege the Directors received any benefits that were not received

on the same terms by *all* common stockholders. Moreover, the Complaint fails to allege how any consideration received by the Directors in the Transactions was material to a majority of the Directors.

IV.    The Court should affirm dismissal of the claims against Wheeler for tortious interference with contract and aiding and abetting a breach of fiduciary duty.

A.    As a threshold matter, both claims necessarily fail because Plaintiffs failed to adequately allege either of the predicate claims, breach of contract (for tortious interference) or breach of fiduciary duty (for aiding and abetting).

B.    In any event, the Complaint's allegations establish that Wheeler did nothing more than negotiate with Cedar at arm's length and enter into a commercial transaction which Wheeler deemed beneficial to its business. Arm's-length negotiations with a counterparty, absent collusion or facilitation of wrongdoing, cannot support a claim for tortious interference or aiding and abetting breach of fiduciary duty.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's grant of [a] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 472 (4th Cir. 2023). To survive a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

## ARGUMENT

### I. The Merger Was Not A Change Of Control That Triggered Preferred Stockholders' Conversion Rights.

Plaintiffs cannot establish a breach of the Articles because no Change of Control occurred. That is a defined term, and the Merger does not meet it because the "acquiring entity," Wheeler, has publicly traded common stock. Plaintiffs rely on an ungrammatical and illogical reading of the definition of Change of Control, insisting the Court must ignore Wheeler's status as a public company and look *only* at whether Cedar is still a public company. That is incorrect. And because there has been no Change of Control, it follows that Plaintiffs cannot establish a breach of an express term of the Articles.

A Change of Control occurs only if two conditions are met. *First*, there must be a literal change of control of Cedar—a third party must "acqui[re]" enough common shares "to exercise more than 50% of the total voting power of all shares of the Corporation." J.A.341 (clause (x)). *Second*, "following the closing of [such] a transaction ..., neither the Corporation nor the acquiring or surviving entity" may

have "a class of common securities" that is publicly traded. J.A.341 (clause (y)).

As explained below, "the acquiring or surviving entity" is only one entity—here, Wheeler. And because that entity has publicly traded common stock, the Merger was not a Change of Control. Plaintiffs insist that there are *both* an acquiring entity (Wheeler) *and* a surviving entity (Cedar), plus the "Corporation" (Cedar again). But even under Plaintiffs' incorrect framing, the question still is whether Cedar or Wheeler has publicly traded common stock. Because Wheeler does, the Merger was not a Change of Control.

## A. A Change of Control Does Not Occur If Either Cedar Or The Entity That Obtained Ownership Of It Has Publicly Traded Common Stock.

A Change of Control occurs only if "neither the Corporation nor the acquiring or surviving entity" has publicly traded common stock. J.A.341. This language identifies only two entities—Cedar and the "entity" that obtained "beneficial ownership" of its shares. The type of entity depends on the type of transaction that occurred: a "purchase" or "other acquisition transaction," J.A.341 (clause (x)), would ordinarily involve an "acquiring entity," and a "merger," *id.*, would ordinarily have a "surviving entity." If neither Cedar nor the third party that obtained ownership of it—whether an "acquiring entity" or a "surviving entity"—has publicly traded common stock, a Change of Control has not occurred.

This reading follows from the definition's plain language. *See Precision*

*Small Engines, Inc. v. City of College Park*, 179 A.3d 1019, 1026 (Md. 2018) ("[W]hen the language of the contract is plain and unambiguous there is no room for construction" (quotation marks omitted)). The use of the singular term "entity," paired with the definite article "the," indicates that the phrase "*the* acquiring or surviving *entity*" refers to a single entity. *E.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 165 (2021) (recognizing that "an article coupled with a singular noun ('the Notice')" is "a combination that … suggest[s] a discrete" item); *Evanto v. Fed. Nat. Mortg. Ass'n*, 814 F.3d 1295, 1298 (11th Cir. 2016) (holding that the phrase "'the disclosure statement'" "connote[s] one particular document by using a definite article ('the') and a singular noun ('disclosure statement')"). That reading is reinforced by the Article's use of the term "entity" only once, following the second adjective, rather than after each of them—"the acquiring or surviving entity," *not* "the acquiring [entity] or [the] surviving [entity]."

The definition's use of the term "has" after the term "entity" is consistent with this reading. A subject containing two alternatives introduced by *neither … nor* "takes a singular verb when the alternatives are singular or when the second alternative is singular." Bryan A. Garner, *Garner's Modern English Usage* 623 (4th ed. 2016). Because "entity" is singular, the verb is appropriately singular (*has*), rather than plural (*have*). Plaintiffs agree. *See* Opening Br. 36-37 (citing *Chicago Manual of Style* § 5.205 (17th ed. 2017)).

19

The remainder of the Change of Control definition confirms that the phrase "the acquiring or surviving entity" lists alternative adjectives modifying a singular noun. *See Plank v. Cherneski*, 231 A.3d 436, 476-77 (Md. 2020) ("In interpreting a contract provision, we look to the entire language of the agreement"). The first part of the definition—clause (x)—addresses the range of transactions that may constitute a Change of Control and identifies only two parties to such a transaction: (1) "the Corporation," and (2) the "person" that "acqui[res] … more than 50% of the total voting power of all shares of the Corporation." J.A.341. The second part—clause (y)—then identifies the circumstances, "following the closing of any transaction referred to in clause (x)" with the "person" obtaining "beneficial ownership" of the Corporation, that will produce a Change of Control. J.A.341. Read together with clause (x), clause (y) is most naturally interpreted to refer only to the same two entities referenced in clause (x)—the Corporation (Cedar) and the entity that obtains ownership of Cedar (here, Wheeler).

This straightforward reading also has the benefit of avoiding an interpretation that counts the same entity (Cedar) *twice* in clause (y)—first, as the "Corporation," and second, as the "surviving entity"—so that clause (y) would read, "*neither* the Corporation [Cedar] *nor* the acquiring [Wheeler] *or* surviving [Cedar] entity has …." There is no rational reason for such double-counting. *See Middlebrook Tech, LLC v. Moore*, 849 A.2d 63, 79 (Md. Ct. Spec. App. 2004) (courts must not

interpret a contract to "permit an absurd or unreasonable result").

In sum, all the textual cues confirm that "the acquiring or surviving entity" is the single entity identified in clause (x) that obtains, whether "directly or indirectly," majority ownership of Cedar's common stock. That entity is Wheeler. Under that construction, the Merger plainly does not satisfy the requirements for a Change of Control because Wheeler indisputably has publicly traded common stock. J.A.46.

**B.     The Merger Was Not A Change Of Control Even Under Plaintiffs' Framing Of The Definition.**

Even if Plaintiffs framing of clause (y) were correct—that "the acquiring or surviving entity" refers to two distinct entities (an "acquiring entity" and a separate "surviving entity," with the second being Cedar), a Change of Control still would not occur unless *neither* has publicly traded common stock. J.A.341. Because Wheeler does, the Merger was not a Change of Control.

**1.     If The Corporation, The Acquiring Entity, <u>Or</u> The Surviving Entity Has Publicly Traded Common Stock, No Change Of Control Occurs.**

Specifying *"neither x nor y or z"* is the same as specifying *"not x, not y, and not z."* Even if the clause were read as listing three entities, Plaintiffs still must show that none of the three has publicly traded common stock:  not the Company, not the surviving entity, and—fatally for Plaintiffs—not the acquiring entity.

"[W]hen the disjunctive *or* is used after a word such as *not* or *without*," each item in the disjunctive list is negated:  "Since you may not do any of the prohibited

things, you necessarily must not do them all." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 119 (2012). The principle that "not A, B, *or* C" means "not A, not B, *and* not C" is as true in grammar as it is in logic, which is why grammarians explain this rule using the logical principle known as "DeMorgan's Theorem." *Id.*; *see* Irving M. Copi, et al., *Introduction to Logic* 353-54 (12th ed. 2005) (explaining DeMorgan's Theorem that *"not x or y"* is logically equivalent to *"not x and not y"*). Thus, granting a benefit to a person only if he does not drink, smoke, *or* gamble is logically equivalent to granting the benefit only if he does not drink, does not smoke, *and* does not gamble. *Reading Law*, *supra*, at 119-20.

The same is true when the terms are introduced using *neither ... nor*, which is equivalent to *not ... not. See, e.g.*, Webster's Third New International Dictionary 1514 (1986) (*neither:* "not any one of more than two"). Introducing two or more alternatives with *neither … nor* shows that "both or all of [the alternatives] are rejected." *Id.*[5] So, the construction *"neither x nor y nor z"* is synonymous with *"not x and not y and not z"*—for example, "*neither* the Supreme Court *nor* the First Circuit *nor* the Second Circuit has ruled" means "the Supreme Court has not ruled

---

[5] *See also* Webster's New World College Dictionary 997 (5th ed. 2016) (nor: "usually as the second in the correlative pair neither … nor, indicating a negation of both parts of the statement); The Merriam-Webster Dictionary 483, 492 (2016) (similar).

*and* the First Circuit has not ruled *and* the Second Circuit has not ruled." *See* Chicago Manual of Style § 5.234; Opening Br. 35-36 (acknowledging same).

The same phrase can also be shortened, without changing the meaning, by using "or" between two parallel parts. Thus, *"neither* the Supreme Court, *nor* the First Circuit, *nor* the Second Circuit has ruled" becomes *"neither* the Supreme Court *nor* the First *or* Second Circuit has ruled." The two are logically equivalent— *"neither x nor y <u>or</u> z"* means *"not x <u>and</u> not (y <u>or</u> z),"* which is synonymous with *"not x <u>and</u> not y <u>and</u> not z."* *Reading Law*, *supra*, at 119-120; *Introduction to Logic*, *supra*, at 353-54. If "Lou is *neither* the pitcher *nor* the second *or* third baseman," then Lou is *neither* the pitcher, *nor* the second baseman, *nor* the third baseman.

Courts have applied these principles in numerous contexts. For example, in *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671 (Fed. Cir. 2015), the Federal Circuit interpreted the phrase an "*absence of* [A] compatible keys **or** [B] record identifier [] columns of similar value **or** [C] format" to require that *none* of A, B, and C be present. *Id.* at 680 (emphasis added) (citing *Reading Law*, *supra*, at 119). Similarly, in *Korman v. Walking Co.*, 503 F. Supp. 2d 755 (E.D. Pa. 2007), the court interpreted the following language—"*no person* that accepts credit cards or debit cards for the transaction of business *shall* print more than the last 5 digits of the card number *or* the expiration date …." *Id.* at 759 (emphasis added). The court rejected the argument that "a business does not run afoul of [the statute] if it prints

6+ digits (but not the expiration date) *or* if it prints the expiration date (but not 6+ digits)." *Id*. at 760. Instead, printing *either one* violated the statute—*"no 6+ digits or expiration date"* means *"no 6+ digits and no expiration date." See id.*

These principles make clear that a Change of Control occurs only if *no* entity has publicly traded common stock. The phrase "neither [Cedar] nor [Wheeler] or [Cedar]" means "not Cedar <u>and </u>not (Wheeler or Cedar)," which in turn means "not Cedar <u>and</u> not Wheeler <u>and</u> not Cedar." Accordingly, for a Change of Control to occur, it must be true that "*not* Cedar <u>*and*</u> *not* Wheeler <u>*and*</u> *not* Cedar has publicly traded common stock," but that is undisputedly not true. J.A.46. Therefore, even if "the acquiring or surviving entity" is read to refer to two distinct entities as Plaintiffs (incorrectly) contend, the Articles still unambiguously indicate that the Merger was not a Change of Control.

## 2. Plaintiffs' Contrary Arguments Are Meritless.

Plaintiffs insist the Change of Control definition is best read—or, at least, can be reasonably read—to provide for a Change of Control if *either one* of the acquiring entity (Wheeler) or surviving entity (Cedar) lacks publicly traded common stock. *See* Opening Br. 28-29. This interpretation rests primarily on Plaintiffs' view that the word *or* ("the acquiring *or* surviving entity") requires a choice between alternatives—and so only one of the "acquiring" and "surviving" entities need lack publicly traded common stock, not both. Opening Br. 29-32.

This interpretation finds no support in the contractual language, creates absurd and counterintuitive results, and misconceives the function of a Change of Control provision. As even Plaintiffs recognize (Opening Br. 26, 29, 32), the word *or*—like any contractual term—must be interpreted in light of the surrounding language in the contract, and even a term that may sometimes be ambiguous when read in isolation can be made clear when read in context. Under any framing of the contractual definition, a Change of Control does not occur unless *both* Cedar *and* Wheeler lack publicly traded common stock, *see* pp. 18-24, *supra*, and none of Plaintiffs' arguments makes their contrary reading plausible.

a. Plaintiffs claim that two "rules of grammar" support their interpretation. *First*, they argue that the use of the singular verb "has" ("the acquiring or surviving entity *has*…") favors their interpretation by showing that the subject is also singular (whereas one would say that the "acquiring *and* surviving entities *have*"). *See* Opening Br. 36-37. But that argument ignores the grammatical effect of the *neither* and the *nor*: *Neither … nor* "takes a singular verb when the alternatives are singular"—*e.g.*, *"neither the nut nor the bolt has rust." Garner*, *supra*, at 623. But despite the singular verb, the negative still negates each item in the list: *"neither the bolt nor the washer has rust"* means that "*both* the bolt *and* the washer *are* rust-free."

*Second*, Plaintiffs argue that if a Change of Control were limited only to

transactions in which *both* Wheeler and Cedar lack publicly traded common stock, the *or* would have instead been a second *nor—neither x nor y nor z.*  Opening Br. 35-36.  For starters, here the *or* joins two adjectives, not the third term in a series.  But even if it were a series— *"neither x nor y or z"*—that would not make Plaintiffs' reading plausible.  Plaintiffs cite no "rule[] of grammar" saying that *or* takes the opposite meaning from *nor*:  to the contrary, *neither* introduces "two or more coordinate words, phrases, or clauses" separated "usu[ally] by *nor* <u>or sometimes by</u> <u>or</u>" Webster's Third New International Dictionary 1514 (1986) (emphasis added); *see* Merriam-Webster's Collegiate Dictionary 830 (11th ed. 2020) (noting that "us[ing] [*neither*] with *or* is neither archaic nor wrong").  And as a matter of logic, there is no difference between *"neither x nor y nor z"* and *"neither x nor y or z"*— both unambiguously mean *"not x, and not y, and not z."  See* pp. 22-23, *supra*.  The contract's use of one of two clear constructions does not render the provision ambiguous.[6]  Plaintiffs have no authority—grammatical, judicial, or logical— suggesting that the use of *or* rather than *nor* in a series reverses the meaning.

Plaintiffs' interpretation not only lacks any basis in the text of the Change of Control definition, but also would produce nonsensical results.  *See Middlebrook*

---

[6] This case is therefore unlike *Meyer v. CUNA Mutual Insurance Society*, 648 F.3d 154 (3d Cir. 2011), where the Third Circuit concluded that a party's preferred interpretation was not the only reasonable one because the language could have been re-written in a way to "put the matter 'beyond reasonable question.'" *Id*. at 165.

*Tech, LLC*, 849 A.2d at 79 (courts must not interpret a contract to "permit an absurd or unreasonable result"). Suppose a law said: "If *neither* Virginia *nor* North *or* South Carolina wants the new courthouse, then Maryland may have it." Under Plaintiffs' interpretation, Maryland would get the courthouse even if North Carolina wanted it, as long as South Carolina did not—yet the law says in plain English that Maryland may have the courthouse only if *none of* Virginia, North Carolina, and South Carolina wants it. Or, under Plaintiffs' theory, the statement "The motorcycle is unsafe to drive if *neither* the engine is checked *nor* the front *or* back tire is secure," would mean the motorcycle is safe to drive if *either* tire (but not both) is secure. Again, nonsense. *See Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 313 (Md. 2019) ("Maryland courts consistently 'strive to interpret contracts in accordance with common sense.'"). It is thus unsurprising that Plaintiffs have not identified a single decision that interprets language using *neither … nor … or* in the manner they propose; indeed, not one of the cases Plaintiffs cite addresses remotely similar language.[7]

---

[7] *See Plank*, 231 A.3d at 475, 477-78 ("In the event any legal action is brought by a party arising hereunder *or* between the parties" (emphasis added)); *United Parcel Service v. Strothers*, 286 A.3d 23, 33, 37 n.11 (Md. 2022) (employee compensation available "if (1) the covered employees provides *definite proof* that satisfies the Commission that (i) …; or (ii) …"); *K&D Holdings, LLC v. Equitrans, L.P.*, 812 F.3d 333, 336 n.4, 339 (4th Cir. 2015) (lease allowed lessee to "inject[] gas, air, water or other fluids into any subsurface strata"); *Meyer*, 648 F.3d at 162-63, 164 (member must be "unable to perform any of the duties of his occupation or any occupation for which he is reasonably qualified"); *SouthTrust Bank v. Copeland*

b.     None of the other provisions Plaintiffs cite from the Articles strengthens their case.   Plaintiffs argue that a Change of Control occurs when Cedar's common stock is no longer publicly traded because, in the event of some hypothetical future *partial-cash* acquisition of Cedar common stock, the formula for identifying the preferred-to-common conversion ratio factors in the average price of Cedar's common stock on the New York Stock Exchange "for the ten consecutive trading days immediately preceding … the effective date of the Change of Control." Opening Br. 33; *see* J.A.343; J.A.344.  According to Plaintiffs, if the Merger was not a Change of Control, it will be impossible to calculate the preferred-to-common conversion in any subsequent partial-cash transaction because Cedar's common stock is not listed on the stock exchange.  Opening Br. 33-34.

To start, Plaintiffs' argument addresses only *one* of the two methods for determining the "common stock price" input for the preferred-to-common conversion formula—one where the consideration for the common stock is "other than solely cash." J.A.344.  By contrast, for a transaction in which the consideration for Cedar's common stock is "solely cash," the price of Cedar's common stock simply equals "the amount of cash consideration per share of Common Stock … to

---

*One, LLC*, 886 So.2d 38, 42 (Ala. 2003) ("[SouthTrust] shall have the exclusive right … to operate an ATM or any other type of banking facility"); *Planned Parenthood of Middle Tenn. v. Sundquist*, 1998 WL 467110, at *12 & n.26 (Tenn. Ct. App. Aug. 12, 1998) (statute providing that abortion may be performed "only if" woman is "informed" of six listed facts, connected with "or").

be received." J.A.344. Plaintiffs conspicuously do not argue that the delisting of Cedar's common stock renders the preferred-to-common conversion formula "unworkable" in this latter kind of transaction. *See* Opening Br. 33. Besides, preferred stockholders do not *always* have the right to convert into a publicly traded class of common stock. Indeed, the Prospectus offering the Preferred Stock explicitly warned of the risk that the preferred stock could remain outstanding after Cedar's common stock is delisted: "If our common stock is delisted, your ability to transfer or sell your shares of [] Preferred Stock may be very limited and the market value of [] Preferred Stock will likely be materially adversely affected." S.A.9 (Prospectus at S-12).

Equally unavailing are the Articles' provisions prohibiting the payment of dividends to common stock if there are unpaid dividends on preferred stock (J.A.338), and giving preferred stockholders the right to elect two Directors in the event preferred dividends have not been paid for six quarters (J.A.342). *See* Opening Br. 34-35. Plaintiffs complain these provisions are toothless when Cedar's common stock is held by a single controlling stockholder because the controlling stockholder will "not need common dividends to extract value from Cedar" and can "completely ignore any directors appointed by Preferred Stockholders." Opening Br. 34, 35. Not so. Because Wheeler acquired Cedar solely by obtaining its common stock, dividends paid to common shares remain the primary way for Wheeler to "extract

value from Cedar." Opening Br. 35. And both before and after the Merger, any directors elected by preferred stockholders will *always* be a minority on the Cedar Board.

c.     Finally, Plaintiffs offer a last-ditch appeal to the "purpose of the Conversion Right," *see* Opening Br. 32-33, but misconceive that purpose as preventing preferred stockholders from "holding Preferred Stock in a private entity." Opening Br. 33.[8] If that were correct, there would have been no reason for the Articles to utilize the *neither… nor… or* construction; the Articles could have simply stated that a Change of Control occurs if a third-party acquires 50% or more of Cedar's voting stock and Cedar's common stock is delisted—full stop. That the Articles could have achieved Plaintiffs' preferred purpose through much more straightforward language suggests that Plaintiffs misconceive the purpose of the Change of Control provision, not that the contractual language should be distorted to carry a meaning it cannot bear.

In fact, the Change of Control provision serves a more modest function:  to protect preferred stockholders from being subjected to a transaction in which the preferred stock remains outstanding in a delisted consolidated entity with no publicly traded acquiror, thus depriving preferred stockholders of the right or ability to

---

[8] In the decision Plaintiffs cite, the description of the purpose behind a change of control provision is dicta, because "both parties agree[d] that a Change of Control" had not occurred. *Poling*, 2016 WL 1749803, at *4 & n.10.

receive periodic reports and financial information about the company in which they are stockholders. That purpose is not only fully served by Defendants' interpretation of the Change of Control provision, but it is reflected in industry practice: numerous change of control transactions have occurred in which a class of the acquired company's preferred stock has remained outstanding following the transaction, *including* where the acquired company's preferred stock remained outstanding as preferred stock of the target and not the acquiring entity. S.A.22 (PS Business Parks, Inc. Proxy Statement at 7).[9]

*       *       *

"[G]iving effect to the clear terms of [the Articles]," a " reasonable person in the position of the parties," *Precision Small Engines, Inc.*, 179 A.3d at 1026, could reach only one plausible interpretation—the Merger was not a Change of Control because Wheeler's common stock is publicly traded. The Court should affirm the dismissal of Plaintiffs' breach of contract claim premised on a violation of an express term of the Articles.

## II.     The Complaint Fails To Plausibly Allege A Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

Having failed to plausibly allege that Cedar breached an *express* term of the Articles, Plaintiffs revert to alleging that Cedar breached the *implied* requirement of

---

[9] The Definitive Merger Proxy Statement by non-party PS Business Parks, Inc. is judicially noticeable and is in the record below (No. 1:22-cv-1103, ECF No. 19-11).

good faith and fair dealing by "deliberately structuring the Transactions with the intent of injuring Preferred Stockholders and depriving them of the fruits of the Articles." J.A.75-76. The Complaint fails to plausibly allege that Cedar breached the implied covenant, and the Court can affirm dismissal on this basis. *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 660 (4th Cir. 2004). First, the Complaint fails to plausibly allege that Cedar acted to prevent preferred stockholders from performing their obligations—the only type of conduct prohibited by the implied covenant under Maryland law. Second, even if the covenant were broader, as Plaintiffs argue, the Complaint's theory seeks to add terms to the contract, in violation of Maryland law.

### A. The Complaint's Allegations Fall Far Outside The Narrow Scope Of The Implied Covenant Under Maryland Law.

The implied covenant of good faith and fair dealing under Maryland law is extremely narrow. It "does not obligate a party to take affirmative actions that the party is clearly not required to take under the contract." *Blondell,* 991 A.2d at 90 (quoting *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182 (4th Cir. 2000)) (brackets omitted). Instead, "the covenant *is limited to* prohibiting one party from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 444 (4th Cir. 2001) (quoting *Eastern Shore Markets*, 213 F.3d at 182-83); *see also CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 208 n.53 (Md. 2012) (restating the *Blondell* formulation).

The Complaint fails to satisfy this narrow standard. Not a single allegation plausibly suggests that Cedar "act[ed] … as to prevent [preferred stockholders] from performing [their] obligations under the contract." *Edell*, 264 F.3d at 444; *see* J.A.76-80. Tellingly, Plaintiffs have never argued that the Complaint satisfies this standard.

Instead, Plaintiffs urge this Court to apply a broader formulation of the implied covenant—one which prohibits a party from "frustrating the right of the other party to receive the fruits of the contract." Opening Br. 38, 43 (quoting *Clancy v. King*, 954 A.2d 1092, 1109 (Md. 2008)). But the Maryland decisions Plaintiffs cite for this proposition precede either *Blondell* or *CR-RSC Tower I*—both of which adopted the narrow formulation identified in *Eastern Market* and *Edell*. And, in any event, neither of those Maryland decisions expanded the scope of the implied covenant.

Start with *Clancy*. That decision addressed a dispute between parties to a partnership agreement, in which one party (Tom Clancy) had unilateral discretion to control the continued publication of a book series, but that discretion was limited by an express provision requiring that it be exercised "in good faith." 954 A.2d at 1106 (emphasis omitted). *Clancy* thus had no occasion to—and therefore did not—broaden the scope of the *implied* covenant of good faith and fair dealing. The same is true of *Questar Builders, Inc. v CN Flooring, LLC*, 978 A.2d 651 (Md. 2009),

which addressed whether "termination for convenience clauses" used in military contracts could be enforced in private contracts and what standard would be used to measure their breach. *Id*. at 663. The court concluded such contracts are enforceable, but to avoid rendering them illusory, and other provisions of the contracts meaningless, it held the right to terminate was subject to an implied duty of good faith. *Id*. at 670-73. Like *Clancy*, *Questar* simply does not support the generalized expansion of the implied covenant.

Plaintiffs' reliance on *Eastern Shore Markets* is even more misplaced. That decision involved a lawsuit by a grocery store against a shopping center based on the shopping center's decision to allow a competing grocery store to lease space in the center. 213 F.3d at 178. This Court held that the grocery store stated a claim, but did so only by addressing the very narrow question of whether "[u]nder certain circumstances, the covenant of good faith and fair dealing … includes an implied duty to refrain from *destructive competition*." *Id*. at 183 (emphasis added). It was on that narrow ground, not a general expansion of the implied covenant of good faith and fair dealing, that this Court allowed the suit to go forward. *Id*. at 185. That holding has no relevance here. The same is true of *Automatic Laundry Service, Inc. v. Demas*, on which *Eastern Shore* relied. *See* 141 A.2d 497, 551 (Md. 1958) ("[U]nder the contract [the defendant] had an obligation not to render valueless his contract with [plaintiff] by permitting the destructive competition here shown").

Accordingly, because the Complaint fails to allege that Cedar interfered with the ability of the preferred stockholders to perform their contract, it does not allege a breach of the implied covenant of good faith and fair dealing.

**B.** **The Complaint Fails To Allege A Breach Of The Implied Covenant Even If Plaintiffs' Expansive View Of The Covenant Were Accurate.**

Even if Plaintiffs were correct that the implied covenant prevents Cedar from "frustrating the right of [plaintiffs] to receive the fruits of the contract," Opening Br. 38, the Complaint still fails to allege a breach of the implied covenant because Plaintiffs received all the "fruits of the contract" they were owed.

The Complaint relies on twelve alleged factors to assert that the Merger was structured to disfavor the preferred stockholders and therefore violated the implied covenant. J.A.76-80. Underlying Plaintiffs' entire theory of liability is the faulty premise that Cedar was somehow obligated to structure the Transactions to trigger preferred stockholders' liquidation or conversion rights. But the Articles contain no such requirement, which is fatal to Plaintiffs' theory. Both this Court and the Maryland Supreme Court have made crystal clear that whatever the scope of the covenant of good faith and fair dealing, it "does not obligate a party to take affirmative actions that the party is clearly not required to take under the contract." *Blondell*, 991 A.2d at 90; *see Eastern Shore Markets*, 213 F.3d at 182. Because Cedar had no obligation to structure the contract to trigger Plaintiffs' liquidation or

conversion rights, Plaintiffs received all the "fruits of the contract" to which they were entitled.

Each of the specific "factors" referenced in the Complaint suffers from this same fundamental flaw or relates to Plaintiffs' now-abandoned argument that the Transactions triggered their liquidation preference. *See* note 4, *supra*. The Complaint alleges, for example, that as a result of the Transactions, Cedar lacked sufficient equity to fully satisfy the preferred stockholders' liquidation preference. J.A.76-77; *see* Opening Br. 15-18. But the Articles expressly authorize Cedar to pay dividends even if the value left in the company is insufficient to satisfy the liquidation preference. J.A.339.[10] In addition, Plaintiffs criticize Cedar's selection of Wheeler as its merger partner, *e.g.*, J.A.76-77, but Plaintiffs do not tie this objection to any contractual obligation of Cedar *under the Articles*—the only source of Cedar's contractual obligations to preferred stockholders. The Articles are unsurprisingly silent on how Cedar may structure a strategic transaction, and Plaintiffs' attempt to place constraints on Cedar's decisionmaking untethered to any

---

[10] The Complaint's allegations on this issue also rest on unsupported inferences. Key Bank's term sheet identified a maximum loan of $130 million, and the commitment letter provided that the loan to value ratio (*i.e.*, "collateral pool leverage") would have to be *less than* 55% of the (yet to be) appraised value of the properties. J.A.354; J.A.356. Therefore, the properties would have to be appraised at $236 million *or more* to justify the maximum $130 million loan ($130,000,000/.55). That the bank loaned $130 million means only that the properties were appraised for *at least* $236 million—not that the properties were worth less than the $290 million valuation.

provision of the Articles violates clear Maryland law. And that same flaw underlies Plaintiffs' other allegations, including that Cedar did not "appoint an independent representative to advocate for the Preferred Shareholders." J.A.78. Plaintiffs simply cannot state a claim when their theory of liability is effectively a stand-alone breach of good faith claim untethered to any obligation in the contract. *See Mount Vernon Props. LLC v. Branch Banking & Trust Co.,* 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006) ("Maryland does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing.").

Accordingly, the Complaint still fails to allege a breach of the implied covenant of good faith and fair dealing even if Plaintiffs' expansive conception of the implied covenant were correct.

## III.    The Fiduciary Duty Claim Was Properly Dismissed.

The district court correctly dismissed Plaintiffs' breach of fiduciary duty claim, and the Court can affirm that decision for either of two independent reasons. *First*, under both Maryland and Delaware[11] law, when a contract specifies the rights and duties owed to preferred stockholders in the context of a particular transaction, the contract alone defines the company's obligations to them. Here, the preferred stockholders' conversion right is entirely a creature of contract, and the Directors

---

[11] Maryland courts "frequently look[] to Delaware courts for guidance on issues of corporate law." *Oliveira v. Sugarman*, 152 A.3d 728, 736 n.4 (Md. 2017); *see* Opening Br. 39 n.7.

therefore did not owe preferred stockholders any extra-contractual duty related to those contractual rights. *Second*, even if such a duty existed, the Complaint still fails to plausibly allege that the Directors breached it.

### A. The Directors Owed Preferred Stockholders No Fiduciary Duties With Respect To Preferred Stockholders' Contractual Rights.

The "preferences and limitations associated with preferred stock exist only by virtue of an express provision"—which is "contractual in nature"—"creating such rights or limitations." *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 593 (Del. Ch. 1986); *see Poling*, 2016 WL 1749803, at *3 ("The difference between common stock and preferred stock lies in preferred stock's preferential rights, which are defined by contract").

The contractual rights of preferred shares limit when fiduciary duties are owed to preferred stockholders. Only when preferred stockholders assert a "right" that "is not a preference as against the common stock, but rather a right shared equally with the common," will the board "owe fiduciary duties to preferred stockholders as well as common stockholders." *LC Capital*, 990 A.2d at 447; *see Jedwab*, 509 A.2d at 593 (similar). By contrast, when preferred stockholders assert a right *unique* to preferred stock, their rights are limited to their contract and directors have no duty to "go further and extend some unspecified fiduciary beneficence on the preferred at the expense of the common." *LC Capital*, 990 A.2d at 448-49 ("When, by contract, the rights of the preferred in a particular transactional context are articulated, it is

those rights that the board must honor."). In other words, because preferred stockholders' rights are predominately contractual, they are "owed fiduciary duties *only* when they do not invoke their special contractual rights and rely on a right shared equally with the common stock." *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *21 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 25, 2017) (emphasis added). Maryland trial court decisions are in accord. *Jolly Roger Fund, LP v. Prime Grp., Realty Tr.*, 2007 WL 3237447, at *8 (Md. Cir. Ct. Aug. 16, 2007) (because plaintiffs held preferred stock with contractual liquidation preference, rather than common stock, controlling stockholder "owe[d] no [fiduciary] duty to plaintiffs as a matter of law" in connection with asset sales); *Poling v. CapLease, Inc*., 2015 WL 13309114, at *9 (Md. Cir. Ct. May 13, 2015) (dismissing fiduciary duty claim because "the claimed breach of fiduciary duty relies upon allegations that defendants' conduct contravenes the Articles Supplementary"), *aff'd*, 2016 WL 1749803 (Md. Ct. Spec. App. May 3, 2016).

These settled principles resolve Plaintiffs' breach of fiduciary duty claim. The Complaint alleges that the Directors acted in "bad faith" and "with the intent to injur[e] Preferred Shareholders" by structuring the Transactions in a way that "deprived [Plaintiffs] of the fruits of the Articles," and failed to "maximize value for [the] Preferred Stockholders." J.A.80. The Articles, however, expressly address the scope of preferred stockholders' rights in the context of the Transactions—including

the scope of their right to convert their preferred stock into common stock. *See* J.A.343-344. Therefore, the Articles *alone* "set forth the bounds of the [Directors'] fiduciary duties" and Plaintiffs "cannot impute any additional, unwritten responsibilities onto" the Directors. J.A.405-406. As a result, the Directors *did not owe* any fiduciary duties to Plaintiffs and were under no obligation to seek out a "fair allocation of the merger consideration between the preferred and common stockholders." J.A.406 (citing *LC Capital*, 990 A.2d at 445).

Plaintiffs' efforts to avoid this clear precedent are without merit. Their primary argument is that dismissal was improper under *Plank v. Cherneski*, which held that a standalone fiduciary-breach claim is cognizable under Maryland law and "may be pleaded without limitation as to whether there is another viable cause of action to address the same conduct." 231 A.3d at 466. But *Plank*—which did not involve preferred stock—does Plaintiffs no good. *Plank* recognized that a breach of fiduciary duty claim requires that there *be* an applicable fiduciary duty in the first place, *see id*. at 481-82, but that is exactly what is missing in the context of preferred stockholders asserting a *contractual* right that is unique to preferred stock and arises from the Articles that govern that preferred stock. *See* pp. 38-39, *supra*. In those circumstances, directors have no duty to "go further and extend some unspecified fiduciary beneficence on the preferred." *LC Capital*, 990 A.2d at 448-49. *Plank*

said nothing to displace this longstanding rule.[12]

Nor do Plaintiffs offer any legitimate basis to distinguish the precedent on which the district court relied. Plaintiffs point to language in *LC Capital* stating that there may be limited situations under which directors are obligated to "fairly reconcile the competing interests of the common and preferred." Opening Br. 50 (citing 990 A.2d at 449). But that is true, *LC Capital* recognized, only if "there is no objective contractual basis for treatment of the preferred" in the "particular transactional context." 990 A.2d at 448-49. Where (as here) there is, the preferred stockholders' rights are entirely a creature of contract and there is no separate and additional fiduciary obligation. *See id*.

It makes no difference to this legal principle that the preferred stock in *LC Capital* was converted into common stock and Plaintiffs' stock was not. Allowing conversion when there is no right to conversion under the Articles is not "honoring" the contract. *Cf.* Opening Br. 49. The rights of preferred stockholders specified in the Articles do not expand simply because they are not triggered in a particular transaction. Nor do the Directors have an obligation to deliberately structure the Transactions to trigger preferred stockholders' conversion right to make the

---

[12] Even if *Plank* were read to authorize preferred stockholders to assert a fiduciary duty claim against the Directors arising from Cedar's alleged breach of the preferred stockholders' contractual rights, the fiduciary duty claim would necessarily fail once it is determined that Cedar *honored* the preferred stockholders' contractual rights. *See* Parts I-II, *supra*.

Transactions meet some abstract standard of "fairness." *In re Trados Inc. Shareholder Litig.*, 73 A.3d 17, 39 (Del. Ch. 2013) ("A board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights."). To the contrary, doing so could well give rise to a claim that the Directors breached their fiduciary obligations to the common stockholders. *See LC Capital*, 990 A.2d at 449.

The Court should affirm dismissal of the fiduciary duty claim on this ground alone.

### B. Even If The Directors Owed Preferred Stockholders Fiduciary Duties, The Complaint Fails To Allege A Violation Of Those Duties.

Alternatively, the Complaint fails to plausibly allege that the Directors' authorization of the Transactions violated any fiduciary duty. Maryland law obligates corporate directors to exercise their duties in "good faith," but also presumes that a director's actions complied with those obligations. Md. Code Ann., Corps. & Ass'ns § 2-405.1(c), (g) ("An act of a director of a corporation is presumed [to satisfy the standards of care under § 2-405.1(c)].").[13] That rule embodies "a presumption that in making a business decision the directors of a corporation acted

---

[13] Section 2-405.1 of the Maryland General Corporation Law is the sole source of the legal duties that a director owes to the corporation or its stockholders. *Eastland Food Corp. v. Mekhaya*, 301 A.3d 308, 323 (Md. 2023).

on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Werbowsky v. Collomb*, 766 A.2d 123, 138 (Md. 2001).

### 1. The Complaint Fails To Allege The Directors Breached Any Duty Of Good Faith.

The Complaint fails to plausibly allege that the Directors' structuring and approving the Transactions violated any duty of good faith owed to preferred stockholders. "[T]o state a claim based on the duty of good faith, a plaintiff must allege conduct motivated by an *intent to do harm*, or actions amounting to an '*intentional* dereliction of duty, a conscious disregard for one's responsibilities.'" *Zucker v. Bowl Am., Inc.*, 2022 WL 1720151, at *10 (D. Md. May 27, 2022) (emphasis added) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 62 (Del. 2006)); *accord* Opening Br. 45-46.

The Complaint does not even come close to meeting this high bar. Plaintiffs identify no non-conclusory allegations to plausibly support an inference that any Director intended to harm preferred stockholders, rather than to act in the best interests of Cedar. *See Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) ("By 'bad faith' is meant a transaction that is authorized for some purpose *other than a genuine attempt to advance corporate welfare* or is *known to constitute* a violation of applicable positive law." (emphasis added)). Rather, the Complaint reflects that the Transactions were arm's-length and negotiated over the

course of many months. *See* J.A.57.

Most of Plaintiffs' allegations of "bad faith" simply reflect the fact that the Directors considered and selected the transaction structure they believed would generate the most value for Cedar, exactly as their duties required. *See LC Capital*, 990 A.2d at 449 (because "[t]he special protections offered to the preferred are contractual in nature," the board's duty "where discretionary judgment is to be exercised [is] to prefer the interests of common stock … where there is a conflict"). For example, Plaintiffs contend the Directors knew the Transactions would "sharply raise the risk profile of the Preferred Stock, immediately crash Preferred Stock prices," and enable Wheeler to acquire the remaining properties in Cedar's portfolio "at a discount to their fair market value." Opening Br. 46, 47. Yet stripped of hyperbolic rhetoric, the Complaint merely alleges that Defendants were *aware* (or should have been aware) of a risk that preferred stock prices would be negatively affected. *See* J.A.76. But that is insufficient to justify a leap to the conclusion that the Directors had an "*intent* to … harm" preferred stockholders, *Disney*, 906 A.2d at 64 (emphasis added), rather than to identify the transactions that would maximize the value to the company and common shares, as evidenced by the robust process the Directors undertook to identify the set of transactions that would maximize the company's value. *See* pp. 7-9, *supra*. Ultimately, the alleged negative effects on preferred stockholders are simply normal risks that accompany owning preferred

stock, which carry limited redemption and conversion rights in exchange for priority over common stock and the right to a substantial dividend. *See* J.A.337; J.A.339; J.A.341. That the risk-reward calculus did not play out exactly as Plaintiffs may have desired does not plausibly translate into a violation of any duty.

The Complaint also alleges that the Directors knew the Transactions would leave Cedar without sufficient equity to cover the preferred stockholders' $161.3 million liquidation preference, and "sought to conceal this deficit by lying about the value of the Wheeler Properties in Cedar's public filings." Opening Br. 47. But even if Plaintiffs' allegation of deceit were plausible,[14] the Articles explicitly authorize Cedar to pay dividends and distributions to its stockholders even if those payments would (as Plaintiffs allege) leave it with insufficient equity "to satisfy the preferential rights upon dissolution of the holders of Series C Preferred Stock." J.A.339. The Directors cannot have breached a duty of good faith by causing Cedar to take action authorized by the Articles. Nor can Plaintiffs base their claim of fiduciary breach on alleged inaccuracies in Cedar's SEC filings, *see* Opening Br. 47; such claims "require the challenged disclosure to have a connection *to the request for shareholder action*." *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) (emphasis added). Here, Cedar's SEC filings did not solicit any action on behalf of *the*

---

[14] It is not, especially given Key Bank's independent valuation of the properties to support its loan. *See* note 10, *supra*.

*preferred stockholders*, who had no right to vote on the Transactions.

Finally, there is simply no requirement under Maryland (or Delaware) law that a board of directors implement procedural protections for the benefit of preferred stockholders—such as "appoint[ing] an independent committee" to advocate for preferred stockholders, or "obtain[ing] a fairness opinion." Opening Br. 47 (citing J.A.59). Ample precedent rejects such requirements. *See, e.g.*, *LC Capital*, 990 A.2d at 451 (such a requirement would "in essence, give [the preferred stockholders] leverage that they did not fairly extract in the contractual bargain").

Otherwise, the Complaint's allegations reduce to unsupported assertions that the Directors "inten[ded] to injure" preferred stockholders by approving and recommending the Transactions. *E.g.*, J.A.76; J.A.80. Such conclusory allegations fail basic pleading standards. *See In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *12 (Del. Ch. Dec. 30, 2019) (finding "conclusory suggestion" of bad faith in complaint "lacks any factual narrative that would allow any inferential explanation of *why* these fiduciaries would so abandon their duties as to engage in bad faith").

### 2. Plaintiffs Have Both Abandoned And Failed To Plead Any Claim For Breach Of The Duty Of Loyalty.

Throughout their brief, Plaintiffs emphasize that they are appealing the dismissal of their claim for breach of the duty of good faith; they never refer to their duty of loyalty claim, much less assert that the district court erred in dismissing it.

*See* Opening Br. 22-24, 45-48, 49. That claim therefore has been abandoned. *See Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 199 n.4 (4th Cir. 2014).

Even if Plaintiffs' brief were read to seek reinstatement of their duty of loyalty claim, the Complaint does not plausibly allege any director self-interest or self-dealing that could override the business judgment rule's presumption of loyalty. To fall within the business judgment rule, "directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it *in the sense of self-dealing*, as opposed to a benefit which devolves *upon the corporation or all stockholders generally*." *Boland v. Boland*, 31 A.3d 529, 549 (Md. 2011) (emphasis added). Moreover, the plaintiff must allege that "a majority" of directors stood to gain personal financial benefits of "sufficiently material importance, in the context of [each] director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties." *Zucker*, 2022 WL 1720151, at *10 (quoting *In re Nationwide Health Props., Inc.*, 2011 WL 10603183, at *14 (Md. Cir. Ct. May 27, 2011)). The Complaint failed to plausibly allege either one.

*First*, the Complaint fails to allege any financial benefit to the Directors separate from the financial benefits "which devolve[d] upon the corporation or all stockholders generally" as a result of the Transactions. *Boland*, 31 A.3d at 549. The Directors received cash payments for their common shares *on the same terms* as every other common stockholder. *See* Opening Br. 5-6; *see also* J.A.33-35. The

presumption of loyalty is not rebutted simply because the Directors did not own preferred stock. *See LC Capital*, 990 A.2d at 452-53 (rejecting argument that "independent directors are disabled from the protections of the business judgment rule … [in] a merger because they own common stock, and not the corporation's preferred stock").

*Second*, the Complaint fails to plausibly allege that the financial benefits the Directors received were material. The Complaint alleges the aggregate amounts received by the Directors for their common shares, but not what portion of those amounts were at the expense of preferred stockholders (*i.e.*, amounts that would have gone to the preferred stockholders instead of the common in a hypothetical "fair" transaction), or why these amounts were financially material to a majority of the Directors. J.A.33-36; *see, e.g.*, *LC Capital*, 990 A.2d at 453 (no reasonable inference of director interestedness absent allegations that a 10% or 20% shift in merger consideration would have been material). Here a majority of the Directors (six out of eight) received total consideration of $540,000 or less for their common stock, *see* Opening Br. 5-6, and any portion arguably obtained at the expense of the preferred stockholders would have been a small fraction of that—likely less than $100,000.[15] The Complaint lacks any allegations that this consideration was

_____

[15] For example, if Cedar had accepted a $240 million all-cash bid (J.A.57) and then paid the preferred stockholders the $25 per share liquidation preference, the total reduction in the $396 million paid to Cedar's common stockholders would have been

material to any of these Directors based on their personal financial situations. *See LC Capital*, 990 A.2d at 453 (rejecting argument that $500,000 was material to corporate directors simply because "[t]hat amount of money … would be material to most Americans").

*     *     *

The Court should therefore affirm dismissal of Plaintiffs' breach of fiduciary duty claim on these alternative grounds in the event it does not affirm based on the district court's reasoning.

## IV.   The Claims Against Wheeler Were Properly Dismissed.

### A.   Plaintiffs Have Failed To Plausibly Allege A Tortious Interference Claim Against Wheeler.

The Complaint alleges that Wheeler intentionally interfered with the preferred stockholders' contract rights by cooperating with the Cedar Defendants to structure the transactions. J.A.81. The district court's dismissal of this claim can be affirmed for two independent reasons:  (1) the Complaint fails to state a cognizable breach of contract claim; and (2) Plaintiffs allege only that Wheeler negotiated an arm's-length commercial transaction.

The elements of the tort of intentional interference with an existing contract include (among others) the defendant's intentional inducement of a third party (here

---

approximately $50 million (less than 13% of the total consideration).

Cedar) to breach a contract, and a breach of the contract with resulting damages. *Blondell v. Littlepage,* 968 A.2d 678, 696 (Md. Ct. Spec. App. 2009), *aff'd* 991 A.2d 80 (Md. 2010). Maryland follows the Restatement (Second) of Torts, *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 117 n.7 (Md. 1994), which requires intentional and improper conduct on the part of the defendant done for the purpose of interfering with the contract, *see* Restatement (Second) of Torts § 767 cmt. a (1979).

### 1. Plaintiffs Have Not Alleged A Breach Of Contract.

To state an intentional interference claim, the Complaint must allege that Cedar "breached express provisions of the Articles Supplementary and the implied duty of good faith and fair dealing in connection with structuring and consummating the Transactions." J.A.81. Because, as set forth above, Plaintiffs fail to allege any theory of breach, the interference claim was properly dismissed.

### 2. Plaintiffs Have Not Alleged Any Tortious Conduct By Wheeler.

In any event, the Court should affirm dismissal of the interference claim because the Complaint fails to plausibly allege the remaining elements of such a claim.

The allegations in the Complaint against Wheeler are remarkably thin: a Wheeler representative met with at least one of Cedar's then-Directors, Wheeler submitted its initial bid, the proposal was accepted, and the Merger closed. J.A.56-57; J.A.60. In other words, the Complaint alleges that Wheeler entered an arm's-

length strategic transaction, but negotiating an arm's-length strategic transaction does not give rise to a claim that the acquiring entity interfered with the contractual rights of a stockholder in the acquired entity. *See Ryan v. Buckeye Partners, L.P.*, 2022 WL 389827, at *15 (Del. Ch. Feb. 9, 2022) (dismissing tortious interference claim against the acquiring entity in a merger because "the only reasonable inference from the Complaint is that the [acquiring defendants] thought the Transaction was in their best interests and pursued it accordingly").

Plaintiffs allege that Wheeler "participated" in the negotiation of a merger that Wheeler deemed beneficial, J.A.81, but fatally missing from the Complaint are any allegations suggesting how Wheeler did (or could do) anything except negotiate a merger transaction that it deemed beneficial to its business. Plaintiffs fail to allege that Wheeler had the ability to influence the Cedar board, that Wheeler participated in Cedar's decision-making process, or that Wheeler conspired with Cedar on how to structure the transaction. Plaintiffs have not asserted any allegation that Wheeler had a say in Cedar's decision to pursue the sale and merger transactions rather than other options. Plaintiffs allege only that Wheeler "actively cooperated" with the Directors. J.A.30. But that can be said of every negotiation when the parties strive to reach a deal both will accept. The failure to allege how any alleged interference occurred dooms the interference claim. *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 354 (4th Cir. 2013) (affirming dismissal of interference claim as not

facially plausible because the complaint failed to allege how the interference occurred).

A complaint cannot stand where the allegations are "merely consistent with a defendant's liability, [but] it stops short of the line between possibility and plausibility of entitlement to relief" needed to state a claim. *Iqbal*, 556 U.S. at 678 (quotation marks omitted). The tortious interference count was properly dismissed.

### B. Plaintiffs Have Failed To Plausibly Allege That Wheeler Aided And Abetted A Breach Of Fiduciary Duty By Cedar.

The Court should also affirm dismissal of Plaintiffs' claim that Wheeler aided and abetted an (alleged) breach of fiduciary duty by the Directors, for two independent reasons: (1) the Complaint fails to allege a breach of fiduciary duty claim against the Directors; and (2) the Complaint alleges only that Wheeler negotiated an arm's-length commercial transaction.

### 1. Plaintiffs Have Not Alleged A Breach Of Fiduciary Duty.

A necessary predicate for stating an aiding and abetting claim is the existence of a fiduciary duty that was breached. *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038 (Md. 1995) (aiding and abetting claim exists only where another person has acted tortiously). Because, as set forth above, Plaintiffs have failed to allege such a breach against the Directors, the aiding and abetting claim was also properly dismissed.

## 2. Plaintiffs Have Not Alleged Any Tortious Conduct By Wheeler.

In any event, the Court can affirm the dismissal because the Complaint fails to plausibly allege that Wheeler engaged in tortious conduct supporting an aiding and abetting claim. Wheeler entered an arm's-length strategic transaction. Wheeler is unaware of any case finding that negotiating an arm's-length strategic transaction amounts to aiding and abetting an alleged breach of fiduciary duty by the selling party's directors.

A complaint fails to allege aiding and abetting where the only allegations are that the acquiring entity took actions "normally attendant" to pursuing the acquisition of a public company. *Shenker v Laureate Educ., Inc.*, 983 A.2d 408, 429 (Md. 2009) (affirming dismissal); *Sutton v FedFirst Fin. Corp.*, 126 A.3d 765, 792 (Md. Ct. Spec. App. 2015) (affirming dismissal). That is the case here. *See also Malpiede v Townson*, 780 A.2d 1075, 1096-98 (Del. 2001) (affirming dismissal of aiding and abetting claim where the plaintiff failed to allege that the defendant participated in the decision by the target's board, conspired with the target's board, or otherwise caused the target's board to decide as it did); *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) (dismissing aiding and abetting allegations where the preferred stockholders received all the consideration and the common stockholders received nothing because of "the long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and

facilitation of fiduciary wrongdoing, constitute aiding and abetting").

As set forth above with respect to the intentional interference claim, fatally missing from the Complaint are any allegations plausibly suggesting how Wheeler did (or could do) anything except negotiate a merger transaction that it deemed beneficial to its business. Therefore, the aiding and abetting claim was properly dismissed.

## CONCLUSION

The Court should affirm the judgment of the district court in full.

Respectfully submitted,

/s/ Jerrold A. Thrope *(by permission)*
Jerrold A. Thrope
GORDON FEINBLATT LLC
1001 Fleet Street
Suite 700
Baltimore, MD 21202
(410) 576-4295

*Counsel for Defendants Cedar Realty*
*Trust, Inc., Cedar Realty Trust*
*Partnership, L.P., and Wheeler Real*
*Estate Investment Trust, Inc.*

/s/William M. Jay
William M. Jay
Benjamin Hayes
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Douglas H. Flaum
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 813-8800

Jennifer Burns Luz
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
(617) 570-1000

*Counsel for the Director Defendants*

Dated: December 22, 2023

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,955, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 365 in 14-point font.


Dated: December 22, 2023


/s/ William M. Jay_____
William M. Jay

**CERTIFICATE OF SERVICE**

I certify that on December 22, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ William M. Jay
William M. Jay